[Sac. No. 5088. In Bank.—May 5, 1939.]

MERIDIAN, LTD. (a Corporation), Plaintiff and Appellant, v. THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants; THE CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

Sloss, Turner & Finney and Murray Bourne for Plaintiff and Appellant.

W. C. Le Hane, as *Amicus Curiae,* on Behalf of Plaintiff and Appellant.

John J. O'Toole, City Attorney, Dion R. Holm, Assistant City Attorney, and A. E. Chandler, for Defendant and Appellant.

Allen G. Wright and Robert M. Searls, as *Amici Curiae,* on Behalf of Defendant and Appellant.

SHENK, J.—Two appeals are here for consideration. One is the appeal of the defendant, City and County of San Francisco. The other is an appeal by the plaintiff. By stipulation both are presented on a single record.

The action involves the rights of the city as an appropriator of water of the Tuolumne River in connection with its Hetch Hetchy project, and the rights of the plaintiff as a riparian owner and appropriator of water downstream from the works of the city.

The plaintiff commenced the action on May 31, 1932, against the city and four other defendants: Turlock Irrigation District, Modesto Irrigation District, Waterford Irrigation District and West Stanislaus Irrigation District. The issues affecting the plaintiff and the city and West Stanislaus Irrigation District were determined. Pursuant to the authority of section 579 of the Code of Civil Procedure, the court caused several judgments to be entered. Certain issues tendered by the plaintiff and the three other defendant irrigation districts remain undetermined in the trial court. No appeal was taken from the judgment against it by the West Stanislaus Irrigation District, and the judgment, in so far as it affects that district, has become final.

The conflicting claims of the parties involve their rights in and to the waters of the Tuolumne and San Joaquin Rivers and their tributaries. The San Joaquin River is a natural water course arising in the Sierra Nevada in Fresno and Madera Counties. It flows through the counties of Fresno, Madera, Merced, Stanislaus and San Joaquin and discharges into an arm of the bay of San Francisco. The Tuolumne River is a tributary of the San Joaquin. It rises also in the Sierra Nevada, has a drainage area of about 1500 square miles, and flows westerly through the counties of Tuolumne and Stanislaus, joining the San Joaquin about two miles above the plaintiffs riparian lands. The constant flow of both rivers, if unobstructed, has always been and, according to engineering opinion, will always be variable. The flow of the Tuolumne varies greatly in amount and in rate from year to year, from season to season, and from time to time in any season. The principal high flow from heavy rains and melting snows occurs during the months of March, April, May and early June of each year.

The plaintiff is the owner of El Solyo ranch, which is located on the west bank of the San Joaquin River with its southerly line about two miles down stream from the confluence of the two rivers. The ranch consists of five contiguous parcels with an aggregate area of 4,320 acres, of which approximately 3,208 are riparian to the San Joaquin River. In 1919 and 1920 the plaintiff's predecessors constructed a system for the irrigation of the ranch, consisting of a pumping plant located on the bank of the San Joaquin River near the northeasterly corner of the ranch, and a system of pipe lines and works for distributing the water pumped from the river. At the time of the trial the irrigated portion of the ranch embraced about 3,700 acres. A portion of the ranch, comprising about 350 acres, has not been prepared for irrigation but is suitable for farming by that method. In the cultivated area are about 800 acres of full-bearing deciduous fruit trees and 600 acres of matured and bearing vines. Crops of almost every description suitable to the locality are grown, including truck garden vegetables, grain and alfalfa. All of the ranch is agricultural land of great fertility and is susceptible of a high degree of cultivation A dairy is also maintained thereon. From 100 to 400 persons are employed in conducting the ranching operations and the development as a whole represents an investment of about $4,000,000. The San Joaquin River is the only available source of supply for the irrigation and domestic use of the ranch, and the flow of the river past the ranch consists largely, and at times almost entirely, of waters contributed to it by the Tuolumne River.

On October 10, 1919, Roy M. Pike, a predecessor in interest of the plaintiff, filed with the state water commission an application for the appropriation of water of the San Joaquin River for the irrigation of El Solyo ranch. The application was approved by the commission, and on March 13, 1933, the division of water rights issued to the plaintiff its license No. 1280 showing the work as contemplated by the application had been completed. The license was for the appropriation of 46.74 second-feet of water from about March 1st to about November 1st of each season for the irrigation of 3,781 acres of the ranch. The system of irrigation works covered by the license is in use for the irrigation of the ranch and the area covered is the entire ranch except 540 acres—which excepted area is riparian to the San Joaquin River.

The rights of the defendant irrigation districts are not involved on these appeals, but a brief notice of their location, purposes and works will contribute to an understanding of the problems under consideration. The Turlock Irrigation District embraces about 185,000 acres and lies south of the Tuolumne River and east of the San Joaquin River in Merced and Stanislaus Counties. The Modesto Irrigation District contains about 81,203 acres and lies north of Tuolumne and east of the San Joaquin in Stanislaus County. The Waterford Irrigation District contains about 14,000 acres and lies north of the Tuolumne and east of the Modesto District in Stanislaus County. Prior to the commencement of this action there had been brought under irrigation in these three districts 140,734 acres, 67,141 acres, and 5,382 acres respectively. The lands of the West Stanislaus Irrigation District border the westerly bank of the San Joaquin River above the plaintiff's ranch about two miles from the confluence of that river with the Tuolumne River.

In 1894 the Turlock and Modesto districts constructed the La Grange Dam across the Tuolumne River near the town of La Grange. By means of the dam the water of the river is diverted into two main canals, the Turlock main canal south of the river and Modesto main canal north of it. The capacity of the diversion works and main structures of the Turlock main canal is 3,000 second-feet and of the Modesto main canal is 2,000 second-feet, of which a capacity to the extent of 250 second-feet has been reserved for the Waterford District by contract between the two districts. In 1922 the Turlock and Modesto districts constructed the Don Pedro Dam across the Tuolumne to form the Don Pedro reservoir with a storage capacity of 261,750 acre-feet. In addition to those works the districts have constructed canals, ditches and other structures for the purpose of delivering water to the lands within their respective boundaries. The Turlock and the Modesto districts have also constructed an electric power plant below the Don Pedro Dam with an installed capacity of 41,100 horsepower. The Turlock District has constructed a second power plant, known as the La Grange power house, at the end of the Turlock main canal intake tunnel. This has a capacity of 6,000 horsepower. Many millions of dollars have been expended in these developments.

For many years prior to the commencement of the action the districts intercepted and diverted part of the flow, and for long periods within the irrigation season the entire flow, of the Tuolumne River by means of their dams and other works.

In 1901 the City and County of San Francisco started a project for the storage and diversion of the waters of the Tuolumne River for the use of the city and other localities adjacent to San Francisco Bay. It has become known as the Hetch Hetchy project and includes reservoirs, power plants and diversion works in the watershed of the Tuolumne River above the Don Pedro reservoir. The first appropriations made in behalf of the city for its project were made by Mayor James D. Phelan on July 29, 1901, for 5,000 inches of the flow of Eleanor Creek below the outlet of Lake Eleanor, and 10,000 inches of the flow of the Tuolumne at the outlet of Hetch Hetchy Valley. These appropriations were followed so closely by diligent survey work for a reservoir site at Lake Eleanor and at Hetch Hetchy Valley that Mr. C. E. Grunsky, then city engineer, was able to transmit to the register of the United States land office at Stockton, under date of October 16, 1901, certain maps and other documents constituting right of way applications for two reservoirs under Congressional Act of February 15, 1901. These applications were not approved until May 11, 1908 (''Garfield Permit'', 36 Land Decisions, 409.) The opinion in that matter fully reviews the history of the applications before the Department of the Interior, including the protests made by many against the use of the Yosemite National Park for reservoir purposes, and the resulting investigations by the government regarding the needs of the city. The capacity of Lake Eleanor reservoir as thus approved was 41,290 acre-feet, and the capacity of Hetch Hetchy reservoir was 107,426 feet. Eighteen notices of appropriation under the state law in force prior to the effective date of the Water Commission Act (December 19, 1914) were posted during the period July 29, 1901, to February 27, 1911, inclusive. These appropriations were posted in the name of the city or one of its representatives, or by William Ham Hall or by Sierra Ditch Water Company. The appropriations made by the last two parties were purchased by the city.

The notices of appropriation of July 29, 1901, for the appropriation of 5,000 inches of the waters of Eleanor Creek and for 10,000 inches of the waters of the Tuolumne River are sufficient for the appropriation of water for the full capacity of Lake Eleanor reservoir and Hetch Hetchy reservoir as approved by the Secretary of the Interior Garfield on May 11, 1908. Much delay in the prosecution of the work ensued. Secretary of the Interior Ballinger issued his order to the city to show cause why the Hetch Hetchy Valley should not be eliminated from the Garfield permit, and his successor, Secretary Fisher, refused to take further action without authority from Congress. No actual construction work could be done on the Hetch Hetchy project until after the approval of the Raker Act on December 19, 1913 (38 Stats. 242). The provisions of that act were formally accepted by the city on January 12, 1914, by Ordinance No. 2598.

The Raker Act provided, among other things, that nothing therein should be construed as affecting or interfering with the laws of the State of California relating to the control, appropriation, use or distribution of water for irrigation or for municipal or other uses, or with any vested right acquired thereunder. The act also required the city to recognize the prior rights of the Turlock and Modesto irrigation districts as then or thereafter constituted or enlarged within certain specified limits for reasonable use of water.

Subsequent to the passage of the Raker Act the city diligently proceeded with its project. Under the provisions of the act Secretary of the Interior Lane, on June 9, 1914, approved an amended application of the city for reservoir and dam site privileges in the Hetch Hetchy Valley to the capacity of 345,000 acre-feet. Under date of December 27, 1915, he approved an amended map for the Lake Eleanor site with capacity of 289,862.9 acre-feet. Other notices of appropriation will be hereinafter referred to. The Hetch Hetchy reservoir was completed in 1923, and as then constructed had a storage capacity of 206,000 acre-feet of water. It was formed by the O'Shaughnessy Dam, a concrete structure 345 feet high, built at a cost of over $7,000,000. Lake Eleanor is situated on Eleanor Creek, a tributary of the Tuolumne River. The dam forming the lake and reservoir was completed in 1918, is 70 feet high, has a storage capacity of 28,000 acre-feet of water and cost over $300,000.

Since the enactment of the Raker Act and prior to the commencement of this action, the city has constructed plants for the generation of hydro-electric power on the Tuolumne River and its tributaries at points above the lands of the plaintiff and the defendant irrigation districts. The principal plant is located on Moccasin Creek, is known as the Moccasin power house, is equipped to generate 100,000 horsepower, and has been operated to that capacity since 1925. A secondary plant is situated on the right bank of the Tuolumne River at a point known as Early intake. It is below the major reservoirs, has a capacity of 4,500 horsepower and has been operated since May, 1918.

Before the commencement of the action the city constructed diversion works known as the Hetch Hetchy aqueduct, designed for the conveyance of waters of the Tuolumne River to the City and County of San Francisco and adjacent territory. The portion of this aqueduct extending from Early intake to the Moccasin power house is about 20 miles in length, was completed in June, 1925, and has a capacity in excess of 620 cubic feet per second. The portion of the aqueduct extending from the Moccasin Creek power house to the vicinity of the City and County of San Francisco was not completed until after the commencement of this action. That portion consists of: (1) The Foothill division, which extends from the Moccasin Creek power house to Oakdale portal at the easterly edge of the San Joaquin Valley, is about 16 miles in length, was completed in May, 1932, and has a capacity in excess of 620 cubic feet per second; (2) the San Joaquin division, which extends across the San Joaquin Valley, is about 47 miles in length, was completed in May, 1932, and has a capacity of 93 cubic feet per second; (3) the Coast Range division, which extends from Tesla portal at the westerly edge of the San Joaquin Valley to Irvington portal in Alameda County, is about 28 miles in length, was completed after May, 1932, and has a capacity of 250,000,000 gallons of water daily; (4) the Bay Crossing division, which extends from the Irvington portal about 24 miles to Crystal Springs reservoir in San Mateo County, from which reservoir water is distributed in San Francisco for domestic and other municipal uses. This portion of the aqueduct has a capacity of 670 cubic feet per second and was completed in May, 1936.

The average annual run-off of the watershed of the Tuolumne River during the thirty-eight-year period in which the run-off was measured,—1895 to 1933,—has been 1,842,-500 acre-feet. In dry years it has been less than 600,000 acre-feet. The foregoing recital of facts is taken from undisputed findings of fact.

The complaint is in the nature of an action to quiet title to water rights and for injunctive relief to protect those rights. Two causes of action are set forth. The first alleges the facts constituting the plaintiff's claim of rights as a riparian owner, the status and claims generally of the defendant irrigation districts and the City and County of San Francisco. It is specially alleged that the city claims an interest in the waters of the Tuolumne River adverse to the plaintiff, but that such claim, if any, "is without any right whatever and is subsequent and subordinate to the rights of said plaintiff as owner of said riparian lands".

In the second cause of action the plaintiff pleaded an appropriative right on the San Joaquin River separate from its riparian right, with priority as of October 10, 1919, over any claim of the city. This appropriative right was alleged to be prior and superior to any right of the city to interfere in any way with the natural flow of the Tuolumne River or the San Joaquin River or to transport away from the watershed any of the waters of those rivers. It is then alleged that the city intends to enlarge the storage capacity of its reservoirs and its diversion system so that the same would be capable of diverting and transporting away from the watershed a constant flow of 620 cubic feet per second.

The plaintiff prayed: (1) That the defendants be required to set forth any claims of right they might have as against the plaintiff in the water of said rivers; (2) that the plaintiff's claimed rights to the water of said rivers be quieted, and that it be adjudged that the defendants have no rights which are not subject and subsequent and subordinate to the rights of the plaintiff as alleged in the complaint; (3) that the defendants be enjoined from setting up any claim to said waters except subject to and in subordination of the alleged rights of the plaintiff; (4) that the city be enjoined from transporting any of the waters of the Tuolumne River away from its watershed; (5) if the court should conclude that the city should not be so enjoined, that then the court

ascertain the damages that would be caused to plaintiff's lands because of such diversion and transportation; (6) that the court fix and determine the extent of the rights of each of the defendants other than the city to take, store, divert and use the water of the rivers; and (7) for general relief and costs.

The answer of the city admitted the contemplated diversion, but denied that such diversion would violate the plaintiff's rights. It also set up seventeen separate defenses based upon claims by appropriation, prescription, intervention of public use, bar of the statute of limitations, and estoppel. On April 3, 1933, the case of *Gin S. Chow* v. *City of Santa Barbara,* 217 Cal. 673 [22 Pac. (2d) 5], was decided, wherein it was first held by this court that the riparian doctrine of *Herminghaus* v. *Southern California Edison Co.,* 200 Cal. 81 [252 Pac. 607], and similar cases preceding it, was no longer in effect in this state and that the doctrine of reasonable use should thereafter be applied to the waters of the state. In its amended answer, filed April 20, 1933, the city disclaimed any intention of claiming under its appropriations any water theretofore used or thereafter required by any riparian owner, including the plaintiff, for useful or beneficial purposes on their riparian lands. The city prayed that its rights be determined and quieted as against the plaintiff.

Prior to the trial of the action, there had always been sufficient water in the San Joaquin River to supply all of the plaintiff's requirements. Upon the trial the court found and concluded that for the reasonable and proper irrigation of the presently cultivated 3,730 acres of its ranch and on the additional irrigable and cultivable 350 acres, the plaintiff was and would be entitled to divert from the San Joaquin River "20,000 acre-feet of water per year, to be diverted at a maximum of 100 cubic feet per second"; that the plaintiff as a riparian owner "at the present time is entitled to divert from the San Joaquin River 13,220 acre-feet of water per calendar year, at a maximum rate of diversion of 66.8 cubic feet per second, and that when all the riparian lands of the plaintiff, after the portion now uncultivated shall have been brought under cultivation are irrigated, the required amount will increase to 14,840 acre-feet per year to be diverted at a maximum rate of 75 cubic feet per second"; that these rights of the plaintiff are subject to the prescriptive rights of the

city and also of the Turlock, Modesto, and Waterford districts, but are prior and superior to all other claims of those defendants and of the West Stanislaus district; and that the plaintiff is entitled to have its water free from pollution caused by any acts of the defendants in excess of their prescriptive rights and which would render it unfit for use on said riparian lands. These conclusions were carried into the judgment.

For years prior to the commencement of this action the Turlock and Modesto districts, by means of their dam and other works, interrupted and diverted part of the flow, and for long periods within the irrigation season the entire flow, of the Tuolumne River. In the years 1918 to 1931, inclusive, they took the entire flow of the river for a minimum of 23 days to a maximum of 275 days per irrigation season, and on an average over the fourteen years of 115 days per season.

From these facts the trial court concluded that the Turlock and Modesto districts are the owners by prescription of a right, prior and superior to the plaintiff's riparian right, to store, regulate and divert waters of the Tuolumne River for the irrigation of lands within their respective boundaries and for the generation of electric power to such an amount as will cause a "gross abstraction" from the river of 775,710 acre-feet per calendar year; to divert into their canals at La Grange the waters so abstracted at maximum mean daily rate of 1790 cubic feet per second for the Turlock district and 1261 cubic feet per second for the Modesto district; and to store and regulate the entire flow of the Tuolumne River in the Don Pedro reservoir within the limits of the foregoing "gross abstraction". By reason of this storage and the releases for irrigation and power purposes the flow of the San Joaquin past the El Solyo ranch is different than it would be otherwise. The result of this method of operation has been to increase and equate the amount of water reaching the ranch during the low water period. Seepage, drainage and spill of the water taken by the districts cause a return flow which the court found was proportionate to the use of water by the districts, and becomes available for use on the plaintiff's lands substantially at the time of greatest requirements. The court found that during the ten-year period preceding the commencement of this action the return flow of

the Tuolumne River between La Grange Dam and the junction of the two rivers just above the plaintiff's properties, mingling with the waters of those rivers, constituted "a volume of water constantly many times larger than will be required for beneficial use on the entire area of the plaintiff's riparian lands and of a quality satisfactory for such use". A further finding is that the return flow from the use of water by the districts, in amounts to which their priority of right is acknowledged by the city, will maintain in the channel of the San Joaquin River along the plaintiff's riparian lands, together with other waters therein, a volume of flow suitable in quality for irrigation use and constantly larger than the requirements for beneficial use on the plaintiff's riparian lands, and that no acts of the districts short of discontinuance of irrigation can diminish the return flow to an extent that the plaintiff will not have sufficient water in the river along its lands to satisfy its riparian rights as fixed by the court.

There is abundant evidence in support of the foregoing findings. According to one of the plaintiff's own witnesses the drainage into the Tuolumne has averaged between 2,400 and 3,800 acre-feet per annum and the spillage about 24,000 acre-feet per annum. Over a sixteen-year period preceding the commencement of this action there was an estimated continuous return flow of 212,800 acre-feet, or about 293 cubic feet per second, at Tuolumne City a short distance above the plaintiff's property, which is about six times the highest average monthly diversion rate for water taken by the plaintiff from the river to satisfy the irrigation needs of the riparian lands in the past. If the drainage and spillage were cut off entirely there would still be a return flow from seepage alone amounting to over 190,000 acre-feet per annum, and no acts of the districts short of a discontinuance of irrigation can diminish such return flow to an appreciable extent or to the extent that the plaintiff will not have sufficient water in the river along its lands to satisfy its riparian right as fixed by the court.

Here it may be noted that upon the trial the plaintiff took the position that it was entitled to have this return flow, without reduction in amount or change in quality by a continuance of the districts' operations under present practices. However, the court concluded that the plaintiff, as a riparian

owner, is not entitled to have the districts continue to conduct their operations in such manner that the return flow "shall continue as heretofore, undiminished in quantity and unimpaired in quality; except that the districts have not the right to change their method of operation arbitrarily or wilfully in a manner not beneficial to the lands within their boundaries so as to result in the diminution in quantity or deterioration in quality of said return waters to the injury or damage of plaintiff or its riparian lands".

The court fixed the rights of the West Stanislaus district as against the plaintiff. That district comprises 21,400 acres lying westerly from the San Joaquin River and southerly and westerly of the lands of the plaintiff. In 1928 it commenced the construction of a pumping plant and intake canal, and in 1929 first diverted and used water from the reservoir for the irrigation of lands within its boundaries. Its intake is on the westerly bank of the San Joaquin River about one-fourth of a mile upstream from the confluence of the two rivers. At times of low flow because of the condition of the two stream channels, substantially all the waters reaching this intake and diverted by the district consists of water added to the San Joaquin by the flow of the Tuolumne River.

The court found that the West Stanislaus district was the owner, subject to the riparian and appropriative rights of the plaintiff, of an appropriative right to divert water of the San Joaquin at a rate of 262.15 cubic feet per second, but that such right had not been exercised for any prescriptive period. It was also found that a public use had intervened to the extent of 60,000 acre-feet of water per calendar year (and no more), which constituted the full requirement of that district and that by its diversion the district would take for public use a portion of the plaintiff's riparian right. The district was accorded but refused to exercise a right to condemn, and judgment was entered enjoining that district from diverting water from the San Joaquin River, at any point above the plaintiff's riparian lands, more than 60,000 acre-feet in any calendar year, or at a higher rate than 262.15 cubic feet per second. This judgment has become final for the reason that no appeal was taken therefrom. The status of this district is set forth somewhat at length because of the contention of the city that the injunction against it should

have gone no further than the injunction against the West Stanislaus district.

The taking of testimony at the trial was concluded on April 25, 1934, and the cause was continued for submission pending the filing of briefs and oral argument.

On September 28, 1935, some nine months and more before the rendition of judgment herein, the trial court entered an order directing that the City and County of San Francisco and West Stanislaus irrigation district have until October 15, 1935, within which to submit a written offer to compensate the plaintiff in money for any damage which the plaintiff might sustain ''as a result of any taking of water by such defendant for public use in excess of the rights of such defendant, together with a written request to this (Superior) court to ascertain the amount of such damage in said action''; that if either or both of said defendants should fail to make such offer and request within the time prescribed, such failure should be deemed a refusal to compensate the plaintiff for such damage, and of a waiver of a right to condemn in this action any property or rights of the plaintiff.

On October 15, 1935, the city filed a reply to the direction contained in the order of September 28th, in which it stated that as the city ''has no desire or intention of taking any water to which the plaintiff is ultimately declared herein to be entitled as against the city, there is no necessity for the city to make any offer to compensate plaintiff''. With much elaboration the city then set forth in its reply the reasons, based on the facts in the case, why it should not be required to offer compensation to the plaintiff, the substance of which was that the city did not propose to take or damage any of the property or rights owned by the plaintiff, and that therefore there was no occasion for an offer or subsequent order of compensation.

As to the water rights of the City and County of San Francisco the court found, among other things not necessary to be stated, that the city has at all times conceded that the Turlock, Modesto and Waterford irrigation districts have rights, prior and superior to any claimed by the city, to the waters of the Tuolumne River to the full extent of their needs, and that the city has not at any time claimed the right to divert for use any of the waters of the river other than waters previously stored by the city; that the water subject to stor-

age by the city without invading the rights of the Turlock, Modesto and Waterford districts are "surplus high waters", defined for the purpose of the findings as "waters flowing at any time in the Tuolumne River and its tributaries above the La Grange dam over and above a daily flow of 4066 cubic feet of water per second of the natural flow of the Tuolumne River, measured at the La Grange dam, during the period of sixty (60) days immediately following and including April 15th of each year and in excess of a like flow of 2416 cubic feet of water per second, measured at the La Grange dam, at all other times"; that prior to the commencement of this action the city (1) has acquired the prescriptive right to store in Hetch Hetchy reservoir and Lake Eleanor, out of the surplus high waters, as defined, flowing in the Tuolumne River and its tributaries, 235,465 acre-feet of water per seasonable year (October 1st to September 30th), and no more; (2) had released the waters so stored for a reasonable beneficial use, namely, the generation of hydro-electric power, but for no other beneficial use; and (3) had returned all the waters so stored and used to the Tuolumne River at a point above all the works of the defendant irrigation districts and above the lands of the plaintiff. By reason of the facts so found the court concluded that the city is the owner by prescription of the right, as against the plaintiff's riparian right, to store in "its reservoirs now in existence with their present capacities and no greater capacities", the "surplus high waters" and no other waters flowing in the Tuolumne River and its tributaries up to the amount of 235,465 acre-feet of water, and no more, for one seasonal year, and to retain said water for power purposes and for no other use, returning all of the water so stored and used to the Tuolumne River above the works of the districts and above the lands of the plaintiff and not otherwise.

The court further found that prior to the commencement of the action the city had stored in Hetch Hetchy reservoir in a single seasonal year of maximum storage (but not continuously for five consecutive years) waters of the river up to the amount of 211,300 acre-feet and had similarly stored, used and released water in Lake Eleanor up to 36,700 acre-feet; that the maximum flow which the city would be able to obtain from the Tuolumne River "by the use of its present storage capacity of its two reservoirs", and without disregard-

ing the prior rights of the defendant districts, and for conveyance to the city and adjacent territory, is 142,000,000 gallons per day. In other words, the court found and concluded that the city had the right to store in its reservoirs and use for municipal purposes the waters of the Tuolumne River at the maximum rate of 142,000,000 gallons per day and that this would be in excess of the reasonable needs of the city probably until 1980; that the storage and diversion of that amount of water would not deprive the plaintiff of water reasonably required by it for the irrigation of its lands, but that the storage of more than that amount would cause the plaintiff irreparable damage.

The court further found that as a part of its ultimate plan the city intended to enlarge the capacity of its reservoirs then in existence so as to provide storage for the diversion to the city and adjacent territory of a constant flow of 400,-000,000 gallons per day, which the court concluded was more than the city could put to a reasonably beneficial use, now or at any time in the future. It was further found that there are at times flowing in the Tuolumne River surplus high waters not required for useful or beneficial purposes upon the lands of the plaintiff and that portions of the flow of the river run unused to and through the San Joaquin River to San Francisco Bay.

The court ordered an injunction restraining the city from storing any of the waters of the Tuolumne River or its tributaries except "surplus high waters" as defined in the findings, or from "storing any of such waters except in its reservoirs now in existence" on the river, "within their capacities as existing at the commencement of this action and no greater capacity"; or from storing in the Hetch Hetchy reservoir "as said reservoir may be enlarged", any greater quantity of water than could be stored with the capacity which it had at the commencement of this action.

In its amended answer filed in April, 1933, the city alleged that it had not intended to enlarge its then storage capacity in the Tuolumne watershed within fifty years. Later it acceded to the request of the federal government in connection with its public works program to raise the O'Shaughnessy Dam to a height of 430 feet. This improvement would provide additional storage of 151,000 acre-feet. The work was well under way at the time of the trial, was completed,

and additional water stored to the extent of the capacity of the raised dam.

Briefly, then, the judgment of the court fixed the amount of water to which the plaintiff was and is entitled, both as a riparian owner and as an appropriator; fixed the amount of water which the city was and is entitled to divert from the watershed of the Tuolumne River, measured by the extent of its prescriptive right to store, at 142,000,000 gallons per day; enjoined the city from storing additional water in its reservoirs to the extent of its increased storage facilities.

The city has appealed from that part of the judgment which enjoined it from storing water in excess of its prescriptive right to store; from diverting in excess of 142,000,000 gallons per day, and which subordinated certain of its appropriative claims to that of the plaintiff. The plaintiff has appealed from that part of the judgment which failed and refused to enjoin the city from conveying any water away from the watershed of the Tuolumne River.

The city, in its opening brief as appellant, states the following as the question involved on the appeal:

"Is a lower riparian owner now entitled, as against an upper appropriator, to any water of a stream in excess of the amount thereof reasonably required for beneficial uses on his riparian lands when diverted by reasonable methods of diversion?"

The plaintiff counters with its statement of the questions involved, the first two of which are as follows:

"1. As against a lower riparian owner, is an upper diverter free to take and waste what water he wants, when he will not and cannot apply it to a beneficial use?

"2. Does the constitutional amendment of 1928 restrict waste by a riparian owner only, or does it also restrict waste by a subordinate taker under an inferior right or no right?"

Counsel for the city state in their opening brief:

"Although other points of less importance are presented in this brief, this appeal would not have been taken if the form of injunction against the City were the same as that against West Stanislaus District."

It is conclusively shown that the amount of water allotted to the city, namely, 142,000,000 gallons per day, is more than the city is or will be able to put to a reasonable beneficial use when delivered at its boundaries or in its vicinity, even

until 1980; that the city, if permitted, will store in excess of that amount, to permit a flow up to 400,000,000 gallons per day, in its enlarged storage facilities on the Tuolumne River, and use the excess for the generation of power or other permissible purposes; and that in order to carry out its plans it is and will be necessary at time to transport large quantities of water temporarily detained in storage through the Hetch Hetchy aqueduct, and permit the same to spill into channels leading into the bay of San Francisco.

It is also conclusively shown that the amount of water allotted to the plaintiff is, and will be for all future time, more than sufficient to supply the reasonable needs of the plaintiff's lands for irrigation and other useful and beneficial purposes.

The question is presented for the first time since the adoption of the constitutional amendment of 1928 as to who has the power of control over the waters in the rivers and streams of the state which are in excess of the present and future needs of riparian owners and prior appropriators.

Counsel for the plaintiff make the following pertinent observation with reference to the recent changes in the water law of this state:

"Generally speaking, the decision of these appeals calls for the application, to the rights of the plaintiff and of the city, of the changes in the water law of this state which have resulted from the adoption, in 1928, of the amendment which added section 3 to article XIV of the Constitution of California. The effect of that amendment has been the subject of consideration by this court in several cases, notably: *Gin S. Chow* v. *City of Santa Barbara*, 217 Cal. 673 [22 Pac. (2d) 5]; *Peabody* v. *City of Vallejo*, 2 Cal. (2d) 351 [40 Pac. (2d) 486]; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal. (2d) 489 [45 Pac. (2d) 972]; and more recently, *City of Lodi* v. *East Bay Municipal Water Dist.*, 7 Cal. (2d) 316 [60 Pac. (2d) 439]. Obviously, it is impossible for this court or any court to cover, in three or four decisions, the entire range of the effect of the amendment upon all water controversies that may arise in this state. The full scope of the new constitutional provision can be determined only after a large number of cases presenting different conditions shall have been decided."

■ In the cases referred to it was established that by the changes in the law the right to use the waters of rivers and streams of the state has been limited to a reasonable beneficial use; that the riparian owner has a prior and paramount right to this use and if necessary is entitled to the full natural flow of the stream or its equivalent undiminished in quantity and unimpaired in quality. The riparian owner is safeguarded in this right by the constitutional amendment.

■ But the amendment also provides that "riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section . . . ''. This provision clearly means that when the law has guaranteed to the riparian owner the use of the waters of the stream to the full extent to which he may put the same for all present and prospective useful and beneficial purposes, and has made available to him the means of protecting the rights so guaranteed, he has received the full measure of benefit and protection to which he is entitled, and can claim no more.

■ There are waters in the rivers and streams of the state to which the riparian right first attaches. The rights of other lawful users on the stream also rightfully attach. In addition there are in many of the rivers and streams of the state great volumes of water which pass on unused to the sea or to an inland drainage basin. In a real sense this excess water is a great natural resource available for the benefit of this and future generations, as the occasion for its use may arise. These excess waters constitute the public waters of the state to be used, regulated and controlled by the state or under its direction.

Section 11 of the Water Commission Act, as originally adopted, contained the following provision:

"And all waters flowing in any river, stream, canyon, ravine or other natural channel, excepting so far as such waters have been or are being applied to useful and beneficial purpose upon, or in so far as such waters are or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is and are hereby declared to be public waters of the state of California and subject to appropriation in accordance with the provisions of this act.'' (Stats. 1913, p. 1018.) The same declaration was carried into the amendments to said section 11 in 1919 (Stats. 1919,

p. 513), and in 1923 (Stats. 1923, p. 127). If it be said that the foregoing statutory declarations were contrary to the doctrine of the Herminghaus case and were impliedly rendered invalid by the decision in that case, the conclusive answer is that the same declarations are implicit in the new state policy promulgated by the constitutional amendment of 1928. That amendment has been controlling since its adoption and is binding in the present litigation. The significance of the constitutional amendment was apparently not appreciated prior to the decision in the case of *Gin S. Chow* v. *City of Santa Barbara, supra* (April 3, 1933). The present action was commenced on May 31, 1932, and the cause of action was grounded on the theory of the Herminghaus case. As hereinbefore stated the city amended its answer on April 30, 1933, so as to allege its defenses within the law as interpreted in the Gin S. Chow case. The trial of the present case took place between February 5, and April 25, 1934. Subsequently but prior to the entry of judgment herein the opinions in the cases of *Peabody* v. *City of Vallejo, supra* and *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* were filed. In ordering findings and judgment herein the trial judge wrote an opinion in which the new doctrine expounded in the Peabody and related cases was recognized, and concerning which the learned judge properly said:

"Injunctive relief will no longer be granted upon mere proof that a diversion above will diminish the stream flow as it passes the riparian lands. If after such diversion there is sufficient water remaining to satisfy the reasonable demands of the riparian owner, he has no legal recourse in respect to such diversion."

However, the findings and judgment later entered proceed on the theory that although his needs and requirements are met and safeguarded in every respect, the riparian owner still has the right to an injunction to limit and control the action of an upper appropriator in storing and diverting the surplus waters of the stream. In other words, the judgment herein is to the effect that after the needs and requirements of all users on the stream, both riparian and appropriative, are fully met and safeguarded to the extent contemplated by the constitutional amendment, the right still remains in the riparian owner to require that the water in excess of all such needs and requirements flow past his lands unused to

the sea, and that an injunction may issue to enforce that right. This is not in harmony with, but is directly contrary to the new doctrine.

Under the amendment of 1928 the rights of the riparian attach to, but to no more than so much of the flow as may be required or used consistently with the amendment. That is, the riparian is entitled to all of the water of the stream, both in the quantity and quality of its natural state, which he is able to put to a reasonable beneficial use, and to be protected in that right by the injunctive processes of the court. But the riparian owner is not entitled to an injunction to control the use of water by an appropriator in the exercise of a right admittedly subordinate but in no way injurious to the riparian right. ▇ It is well settled that an injunction is an equitable remedy available generally in the protection or to prevent the invasion of a legal right. In a case such as the one before us the right and its actual or threatened invasion must be shown. But the right must first be shown. Here the right to an injunction to protect and safeguard the plaintiff to the full extent of its beneficial requirements has been shown. But the right to an injunction to control the waters of the stream in excess of the plaintiff's needs is not shown, and the judgment herein is erroneous to that extent.

▇ Inasmuch as the prevention of waste of water is imposed on the riparian under the new doctrine, counsel for the plaintiff, in their ''Questions Involved'', inquire if this same restriction against waste is not imposed on a subordinate taker under an inferior right or no right. Obviously, the answer is in the affirmative. The duty not to commit waste is enjoined on all users of water. An accepted definition of the term ''waste'', as applied to the use of water, may be said to be: ''To use needlessly or without valuable result; to employ prodigally or without any considerable return or effect, and to use without serving a purpose.'' (Webster's New International Dict., 2d ed.) The term is necessarily relative. As denounced by the amendment of 1928, it was the use of water by a riparian owner under an asserted, and theretofore protected right to compel the waters of the stream, without any benefit to himself, to flow to a lower level and on to the sea when otherwise a beneficial use could be made of the same.

■ There are rivers and streams particularly in the most northerly part of the state whose waters flow freely to the sea in the course of nature and there is relatively little need otherwise for their utilization. Great quantities of water in those rivers and streams pass on to the sea because no other recognized beneficial use for the same has as yet been developed. There is no waste in a constitutional sense in permitting such water thus to seek and attain its natural level. There are also great quantities of water in other rivers of the state, such as the Sacramento and its numerous tributaries, the Stanislaus, the Tuolumne, the San Joaquin, the Merced, the Kings and the Kern, not now needed by any users, which find their way to the sea or other natural outlet. To permit water thus to pursue its natural course is not the wasting of water in a legal sense. No one is injured or damaged thereby except in times of great flood when nature takes a tremendous toll from all in the path of the torrent, with resulting property damage and human suffering. Much benefit has been brought about and will yet ensue by the restraint of those excess waters. They are not necessarily ''vagrant or enemy'' waters. They may be the usual recurrent floods and as such are a part of the natural flow of the stream. To guard against them extensive protective measures, such as levees and other flood control works, have been taken and constructed and are maintained at great cost by and with the aid of the state. In June, 1935, floods on the San Joaquin broke through the levee protecting the El Solyo ranch, causing great damage to the plaintiff. In the spring of 1938 the state, at the request of the plaintiff, expended its funds in the protection of said ranch from the floods of that period. The many appropriations by the legislature for flood control generally throughout the state have been large and burdensome. The paramount importance of the conservation of the water resources of the state, including excess waters, has been recognized and emphasized for decades culminating in the original Water Commission Act in 1913. The necessity for gathering and distributing flood or other waters not presently under beneficial use in the streams of the state was accentuated. The cooperation and aid of the federal government in working out some approved and comprehensive plan for the control and development of our water resources have been enlisted by the governor and the legislature. (For example: Stats. 1927,

p. 2400; Stats. 1935, p. 68.) Aid to that end has been given and is being furnished in connection with the water development in the great central valleys. In truth, the program of the state in developing and conserving its water resources has progressed to the stage where it should be said that the restraint and storage of water in the upper reaches of our rivers and streams as a means of protection against damage by flood and of equalizing and stabilizing the flow are beneficial uses. If this be not so the efforts of the state and the federal government in providing primarily for storage, flood protection and stabilization of the water supply of the Sacramento and San Joaquin Rivers by means of the Central Valleys Project (Stats. 1933, p. 2643), are beyond the pale of lawful enterprise and, according to the theory of the judgment of injunction herein, subject to the right of those farther down the stream to prohibit, even though such storage cause the lower owner no damage and be in fact of great benefit to him.

The federal government has constructed a huge dam on the Colorado River, the primary purpose of which was to restrain and store the flood waters of that river and by equalizing the flow not only protect the Imperial Valley from a continuing threat of inundation, but also make water available for irrigation at times when most needed. The completion of that protective and conservation enterprise has made possible the works at Parker Dam for the diversion of stored water to the distributing system of the Metropolitan Water District at an estimated cost of $120,000,000. (*Metropolitan Water Dist.* v. *Whitsett,* 215 Cal. 400 [10 Pac. (2d) 751].) These great projects are further confirmation of the fact that the storage of fresh water is deemed essential to the growth and progress of the state. It was undoubtedly the purpose of the proponents of the amendment of 1928 to make it possible to marshal the water resources of the state and make them available for the constantly increasing needs of all of its people. In according to that great purpose its proper significance it is necessary and appropriate to declare, as inherent in the plan, that the storage of water for the purposes of flood control, equalization and stabilization of the flow and future use, is included within the beneficial uses to which the waters of the rivers and streams of the state may be put within the intent of the constitutional amendment. But such

right of storage must necessarily be subordinate to all beneficial uses on the stream made in the exercise of riparian and prior appropriative rights. And the right of storage may be exercised only pursuant to appropriations lawfully made. "The problem in every case is to ascertain what portion of the product of the stream is subject to appropriation after all reasonable beneficial uses on the part of those having paramount rights have been enjoyed or safeguarded." (*Peabody* v. *Vallejo, supra,* at p. 375.)

█ The State Water Commission (now Department of Public Works, Pol. Code, sec. 363e), has the power under section 10 of the act to investigate all streams of the state for the purpose of ascertaining whether the use of water therein is in conformity with the water appropriation laws of the state. And the power extends to the use of water made under appropriations or attempted appropriations acquired or asserted prior to the passage of the act. By section 15 of the act the commission is given power to allow the appropriation for beneficial purposes of unappropriated water under such terms and conditions as in the judgment of the commission will best develop, conserve and utilize in the public interest the water sought to be appropriated. █ It should be the first concern of the court in any case pending before it and of the department in the exercise of its powers under the act to recognize and protect the interests of those who have prior and paramount rights to the use of the waters of the stream. The highest use in accordance with the law is for domestic purposes, and the next highest use is for irrigation. When demands on the stream for those and other recognized lawful purposes by riparians and appropriators are fully met and an excess of water exists, it is for the state to say whether, in the conservation of this natural resource in the interest of the public, the diversion is excessive.

█ In section 38 of the Water Commission Act any unauthorized diversion of water subject to the provisions of the act is declared to be a trespass and the Department of Public Works is authorized to proceed in the superior court to have such trespass enjoined. There need be no apprehension therefore lest rights become vested, by prescription or otherwise, in an excessive use of water or in a use for unauthorized purposes.

 We conclude that the waters of the Tuolumne River and its tributaries in excess of the needs of lower riparian owners and prior appropriators for all reasonably useful and beneficial purposes have been released by the constitutional amendment of 1928 for storage and other beneficial uses incident thereto as above indicated, and that the injunctive or other processes of the court are not available to the lower riparian owners or appropriators to prevent the storage of such excess waters.

 The record in the present case shows that the water allotted to the plaintiff by the trial court is abundantly sufficient in amount to supply all of its needs and that no substantial damage to its lands has in that respect resulted by reason of the city's storage. It is true that there is evidence to the effect that by reason of the operations of the irrigation districts upstream from the plaintiff's lands the mineral content of the water as it reaches those lands is somewhat increased by the use thereof for irrigation on lands within those districts and its return to the stream by percolation and drainage. We cannot conclude, however, that the court based its judgment of injunction on the alleged impairment of the quality of the water of the river by the city's increased storage. It appears that the irrigation districts upstream from the plaintiff exercised their rights of priority during the ten-year period preceding the commencement of this action; that during that period there had been no impairment of the quality of the water at the plaintiff's place of diversion by reason of the exercise of such rights, and that if the districts continue their operations as heretofore the riparian right of the plaintiff to water of a suitable quality will be fully protected and will suffer no substantial impairment. There is no evidence that the irrigation districts will or intend to discontinue their operations as heretofore. If the trial court intended by its judgment to enjoin the city's use of its enlarged storage facilities on the showing of impairment thereby of the quality of the water of the stream it must be said that the evidence on this issue is not of sufficient substantiality to warrant the injunction ordered. In fact, the court found on sufficient evidence that "the 'return flow' in the Tuolumne river has not in the past contained, and does not now contain a sufficient concentration of such salts, alkalis, and other chemical substances to render such water unfit for irrigation use on the

plaintiff's riparian lands.'' The alleged ''serious and threatening'' damage of pollution, in the absence of actual pollution, would not justify the injunction ordered herein, especially when protective measures short of absolute prohibition may, if necessary, be applied by the court. Obviously, if the city's diversions should result in making the water of the river unfit for use at the plaintiff's location, and the release of fresh water by the city and its return down the river channel would freshen the water to the required extent, the city could by proper order of the court be required to make such releases without rendering useless the city's increased storage facilities. The distance between the storage works of the city and the plaintiff's land is not too great to render this solution unavailing, and the amount of water under the control of the city, pursuant to the judgment, is abundantly sufficient to enable it by such release to protect the flow at the plaintiff's location against any substantial pollution. Furthermore, the measurement of the flow as prescribed by the court, as next discussed in this opinion, would tend greatly toward an assurance of 'a lack of pollution at the plaintiff's location.

In its points of ''less importance'', the city urges that the measurement of the plaintiff's water right as fixed by the court is not justified by the evidence. The court first determined the area of the plaintiff's riparian and nonriparian lands, and then fixed the amount of the plaintiff's reasonable requirements for water for both present uses and future needs. The decree declared the plaintiff, as a riparian, to be the owner of the right (subject to the city's prescriptive rights, but superior to all other claims of the city) to divert for reasonable use upon its cultivated riparian lands, 13,220 acre-feet of water per calendar year, at a maximum rate of 66.8 cubic feet per second, and to divert from time to time such additional quantities of water as may be required for reasonable future use. The court did not carry into the decree its further findings with reference to the future needs of the plaintiff, but by an appropriate provision of the decree, retained jurisdiction of the cause so that if the plaintiff should require more water in the future, a determination of the question may then be made. The objection of the city is not directed to the extent of the plaintiff's award, but to the prescribed method of measuring the allowed quantities of water on a continuous flow basis annually by using the high maxi-

mum flow for July as the measure of the plaintiff's right. The point is that the court should have fixed as the measure of the plaintiff's right the monthly requirements as set forth in the plaintiff's undisputed evidence on that subject and as particularly shown by the schedule in the plaintiff's exhibit 115. The city's contention seems to be well taken, but it does not follow that the city is so prejudiced by the measurement on this annual basis as to require a reversal or modification of the judgment. During the month of July, according to the evidence, the requirements of the plaintiff for irrigation are at the peak, and it is on that peak requirement that the plaintiff's right is measured on a continuous annual flow basis. If it should develop in operating under the award as embodied in the decree, that the method prescribed by the trial court would impose an undue burden on the required releases to the prejudice of the city, or of any other user of water from the river, the court under its reserved power may readjust the measurements on such basis as may be deemed necessary.

The city also urges the point that the findings and conclusions of the court wherein certain notices of appropriation filed and recorded by the city are found to be ineffective for irregularity or nonconformity with the statute are unwarranted. The questioned findings were in response to issues tendered by the second cause of action of the complaint in which the plaintiff pleaded its appropriative right with priority as of October 10, 1919, over any claims of the city, and prayed that its title be quieted. In answer the city alleged that it owned forty-seven appropriations in connection with the Hetch Hetchy project and that the plaintiff's appropriative right was acquired subsequent to the city's rights; hence that title to those rights should be quieted against the plaintiff. As a further defense the city alleged its plan for the ultimate development of the Hetch Hetchy project and that it owned the right by appropriation as against the plaintiff to detain and store for future use for the development of power for domestic and municipal purposes in the City and County of San Francisco and adjacent territory, sufficient water of the Tuolumne River to allow diversion by it of a constant flow of 400,000,000 gallons per day.

The city did not plead a prescriptive right as against the plaintiff's claim of appropriation as it did against the plaintiff's asserted riparian right. The plaintiff's right as an ap-

propriator was fixed by the court at 46.74 cubic feet per second. On the issue of priorities the court found that by virtue of five specified appropriations the city is the owner of appropriative rights, prior and superior to the plaintiff's appropriative right, to store in Lake Eleanor not to exceed 5,000 miner's inches, or 100 cubic feet per second; in Hetch Hetchy reservoir not to exceed 35,000 miner's inches, or 700 cubic feet per second; in the proposed Cherry Valley reservoir not to exceed 25,000 miner's inches, or 500 cubic feet per second; and to divert into the Hetch Hetchy aqueduct at Early intake not to exceed 25,000 miner's inches or 500 cubic feet per second. (The term "Miner's inches" used in the findings as a unit of flow refers to miner's inches measured under a four-inch pressure, fifty of which are equal to one cubic foot per second. A cubic foot per second is equivalent to 646,272 gallons per day.)

The prior notices of appropriation found by the court to be valid were designated 1 (a) and 3 (a), posted by Mayor Phelan on July 29, 1901, for 5,000 inches of the waters of Eleanor Creek below the outlet of Lake Eleanor and 10,000 inches of the waters of the Tuolumne at the outlet of Hetch Hetchy Valley. These notices were superseded by similar notices 1 (c) and 3 (b) posted by the city engineer on October 1 and September 29, 1908. Notice 3 (c) posted by the city on February 18, 1911, for 25,000 inches of waters of the Tuolumne at the outlet of Hetch Hetchy Valley was also found to be valid. It was upon these notices of appropriation that the court based its conclusion that the city was the owner of the appropriative rights prior to and valid against the plaintiff's appropriative rights, to store in Lake Eleanor not to exceed 5,000 inches and in Hetch Hetchy reservoirs not to exceed 35,000 inches. The city claims that its notices were sufficient to entitle it to store to the full capacity of Lake Eleanor reservoir site as enlarged and as approved under the provisions of the Raker Act (289,-862.9 acre-feet), and to store to the full capacity, as enlarged, of the Hetch Hetchy reservoir (345,000 acre-feet).

The city argues that under the code method of appropriation no provision was made for giving notice of diversion for storage; that if an appropriator of water to be stored had specified in his notice the amount to be impounded, he would have had to name an amount of water greatly disproportionate to the size of the contemplated diversion ditch; that the logical course, and the course followed by the city, was to

specify in the notice the amount, corresponding to the capacity of the described ditch, of regulated flow which would be obtained from storage. In other words the city contends that under the code method an appropriation of a specified amount of water conferred the right to impound such additional water as might be necessary to enable the appropriator to obtain from storage a regulated flow up to the amount stated in the notice of appropriation. The city urges the application of this theory. The plaintiff contends that the argument advanced by the city is inconsistent with the entire theory of the law of appropriation. Whatever may be the correct solution of this point, we think it is clear that the city's notices of appropriation found to be valid and those which were erroneously found to have been irregular, were more than sufficient to permit the operation of the city's increased storage facilities.

Included in the notices which the court found to be irregular and therefore subordinate to the plaintiff's appropriative rights, is notice 1 (e) dated February 27, 1911, for "all the water, natural or stored, here flowing in Eleanor Creek at the point which this notice is posted". This notice, if valid, is sufficient for the appropriation of enough water for the full capacity of Lake Eleanor reservoir as enlarged. The court found this notice to be invalid because it did "not state the amount of water claimed", as required by section 1415 of the Civil Code, in effect at the time the notice was posted, and it is argued that because the amount was not stated in the notice the city cannot claim priority under the doctrine of relation.

The purpose of the notice was to notify "all concerned" of the intentions of the city to appropriate, store and use the waters of the river for domestic and municipal uses. It was said by this court in 1880 that notices of intention to appropriate water were to be liberally construed. (*Osgood* v. *El Dorado Water & Min. Co.*, 56 Cal. 571, 579.) We are inclined to apply such a rule to this notice under the special circumstances here shown wherein it appears that the notice plainly indicated the maximum of water claimed and that the capacity of the enlarged Lake Eleanor reservoir as approved by the Secretary of the Interior Lane, on December 27, 1915, nearly four years before the plaintiff's notice,

and as actually constructed, made certain that maximum at 289,862.9 acre-feet.

 The trial court also found notice of appropriation 2 (c), filed October 24, 1909, for 50,000 miner's inches to be stored in the proposed Cherry Valley reservoir, to be invalid on the ground that it failed to state the size of the flume, ditch, pipe or aqueduct by which it was intended to divert the water and that the notice was recorded on the eleventh day after posting instead of within ten days as provided by former section 1415 of the Civil Code. This notice stated that it was the intention to divert the water "by a conduit, pipe, ditch, flume or tunnel in size as may be hereafter determined". It is the contention of the city that this notice was a sufficient declaration of the city's intentions and that the alleged defect and the recordation of the notice on the eleventh day should not be held to subordinate the city's notice to the notice of the plaintiff filed ten years later, during all of which time the plaintiff and its predecessors in interest had notice of the city's plans. We are inclined to agree with the city's contention as applied to the facts here shown, but a contrary conclusion would not affect the city's right to store water in its reservoirs to their enlarged capacities under its other notices of appropriation.

 The city claims priority for two other appropriations, one for 15,000 miner's inches, posted October 4, 1908, on the northerly bank of the Tuolumne River near the mouth of Jawbone Creek; and the other for 25,000 miner's inches, posted February 28, 1911, also on the northerly bank of the Tuolumne River near the mouth of Jawbone Creek. A description of those two notices was inadvertently omitted by the city in its amended answer. On the trial the city introduced in evidence exhibit No. 572 which purported to contain a description of all of the city's notices of appropriation. Counsel for the city relied particularly on eighteen of these notices, but failed to mention the two inadvertently omitted in the answer, and on which later it was sought to rely. During the argument the counsel for the city requested that it be permitted to consider these two notices in evidence. On objection by counsel for the plaintiff on the ground that the offer came too late, the court denied the request. If these two notices are, as claimed, important in support of the city's rights in the premises, we think the court may well have

permitted them in evidence, inasmuch as they were then a part of exhibit No. 572 and no objection to their sufficiency appears to have been made. If the time ever comes when the city may feel the necessity of relying on the additional notices, the questions relating to their status may be passed upon. According to the showing here made, the notices of appropriation found by the trial court to be regular, and those declared herein to be sufficient, cover all the water that the city will need, and it is protected by the judgment for all its requirements. Its real objection is to the limitations on its storage program prescribed by the injunctive order, and as to which the plaintiff is not legally concerned so long as it is safeguarded in its right to all the water it needs, both in quantity and quality, at its point of diversion.

The city must therefore be upheld in its contention that no substantial damage to the plaintiff's riparian or appropriative rights has been shown and that the relief granted to the plaintiff should have been limited to an injunction restraining the city from storing water in excess of its prescriptive right at times when there is not flowing at the plaintiff's land the quantity of water which the plaintiff can beneficially use and of a quality unimpaired by any act of the city beyond the exercise of its prescriptive right. However, it will not be necessary to reverse the judgment in order that the proper result be effected.

It seems appropriate here to state that we are dealing in this action with a controversy between the city and but one user of water on the Tuolumne River, and the judgment is necessarily confined to the issues presented by the parties to this action. This method of resolving controversies involving the rights of the users of water on the river is necessarily piecemeal, unduly expensive and obviously unsatisfactory. This court pointed out first in *Wood* v. *Pendola,* 1 Cal. (2d) 435 [35 Pac. (2d) 526], and then in the cases of *Peabody* v. *City of Vallejo, supra,* and *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* a method by which under section 24 of the Water Commission Act, the rights of all users of water on the river may be appraised and determined in one proceeding. This method would seem to be especially desirable where the state's interest in the excess waters of the stream may be made to appear and the claim of public

agencies as users on the stream render it burdensome for private users severally to assert their rights.

On the plaintiff's appeal it is contended that it is entitled to an injunction restraining the city from storing any water in addition to its prescriptive right to store and from diverting any water of the Tuolumne River whatsoever. From what has been said it follows that the plaintiff's established and conceded right does not include the power of control over the disposition of water in excess of what it can beneficially use. To the extent of such beneficial use, however, it is entitled to full protection; and the judgment so provides.

The definition of "surplus high waters" as incorporated in the findings would seem to be too restrictive as a guide or general rule. When the expression is used in the sense of waters in excess of the beneficial needs of all lawful users on the stream it is all-inclusive for the purposes of this case and for general purposes. Such excess waters are defined to be the waters of the stream subject to appropriation for beneficial use over and above what may reasonably be subjected to a beneficial use on the lands bordering the stream (*Rindge* v. *Crags Land Co.*, 56 Cal. App. 247, 252 [205 Pac. 36]), under rights fixed by the riparian status of the lands and by prior appropriation. The findings, conclusions of law and judgment in the use of the term "surplus high water", must therefore be deemed to conform in their application to what is here determined to be the true character of the waters which the city, in addition to its prescriptive right, claims the right to store, namely, the excess waters of the stream as above defined.

We therefore conclude:

1. That the plaintiff as a riparian owner has the right, subject to the city's prescriptive right, to all the water of the Tuolumne River which it can use on its riparian lands for useful and beneficial purposes as contemplated by the constitutional amendment of 1928; that the plaintiff's rights as such riparian and also as an appropriator are fully recognized and protected by the judgment of the trial court; that when the plaintiff's rights as a lower riparian owner and appropriator are thus protected, the plaintiff may not lawfully complain of, and has no right to prevent or control, the storage of waters in the upper reaches of the stream for

flood control, stabilization and equalization of the flow, and other beneficial uses; that the plaintiff has not been damaged by the operation of the city's storage facilities and in fact may be greatly benefited thereby.

2. That the City and County of San Francisco, as against the plaintiff, has the right to store the excess waters of the stream as herein defined, for the purposes of flood control, stabilization and equalization of the flow and other beneficial uses, and as "holdover storage" to provide further assurance of the continuance of its municipal supply in periods of drought.

3. That the excess waters of the river constitute a natural resource subject to regulation by the state; that the people of the state have by the constitutional amendment of 1928 released such excess waters from the former restrictions and limitations on the use thereof and have made them available for further beneficial uses as indicated herein; that the state by statute has also provided safeguards against the unreasonable, or excessive, or unauthorized use of such excess waters; that until it is made to appear that the use of such excess waters is required for beneficial purposes by riparian owners or appropriators having a prior right, the city has the preferential right to store and utilize such waters to the extent of its enlarged storage facilities.

From what has been said the "judgment and decree" should be and it is modified in the following respects:

Paragraph IV is modified to read as follows:

"That the defendant, the City and County of San Francisco, is the owner by prescription of a right, prior and superior to the plaintiff's riparian right, to store in its Lake Eleanor Reservoir and Hetch Hetchy Reservoir the waters, including the excess waters, of the Tuolumne River and its tributaries, up to 234,000 acre feet of water, and no more, at any one time, and up to a total of 235,465 acre feet of water, and no more, in any seasonal year, extending from and including October 1st of any year to and including September 30th of the next succeeding year, and to release the water so stored and use it for the generation of hydro-electric power; provided that when there is not flowing at the plaintiff's land the quantity of water to which it has been found to be entitled, and of a quality substantially unimpaired by any act of the city beyond the exercise of its prescriptive

right, the waters so stored and then being used for power purposes shall be returned after such use to the Tuolumne River at a point above the works of the defendant, Turlock Irrigation District, Modesto Irrigation District and Waterford Irrigation District, and above the lands of the plaintiff.''

Paragraph V is modified to read as follows:

''That the defendant the City and County of San Francisco, its officers, superintendents, employees, attorneys and servants, or any of them, be and they are and each of them is, enjoined and restrained from storing any of the waters of the Tuolumne River or its tributaries in excess of its prescriptive right, when there is not flowing at the plaintiff's land the quantity of water to which it has been found to be entitled and of a quality substantially unimpaired by any act of the city beyond the exercise of its prescriptive right.''

Paragraph VIII is modified to read as follows:

''That the defendant the City and County of San Francisco is the owner of appropriative rights, prior and superior to the plaintiff's appropriative right, to store in Lake Eleanor reservoir flows of the tributaries of the Tuolumne River to the capacity of said reservoir as enlarged; to store in the Hetch Hetchy Reservoir flows of the Tuolumne River to the capacity of said reservoir as enlarged; and to store in the proposed Cherry Valley reservoir flows of the tributaries of the Tuolumne River not to exceed 500 cubic feet per second, provided that said proposed reservoir shall hereafter be completed and put into use with due diligence; and to divert into the Hetch Hetchy aqueduct at Early intake flows of the Tuolumne river and its tributaries not to exceed 500 cubic feet per second. That the plaintiff's appropriative right is prior to all other additional appropriative rights or claims of said defendant.''

As so modified the judgment is affirmed, neither party to recover costs on appeal.

Waste, C. J., Curtis, J., Sturtevant, J., *pro tem.*, Nourse, J., *pro tem.*, and Seawell, J., concurred.

EDMONDS, J., Dissenting.—In my judgment, the question presented for decision in this case is much broader than that stated by my associates, and the facts upon which it rests compel a very different conclusion.

Unquestionably, no restriction should be laid upon the City of San Francisco to store and use, by diversion or otherwise, all water of the Tuolumne River which it can now or hereafter put to a beneficial purpose, subject, of course, to the superior rights of others to a portion of the flow of the stream. But a city, because it is a city, has no more right to divert water from its natural course and waste it than has an individual property owner. Water in California is so necessary to the development of both cities and agricultural regions that its use must be scrupulously safeguarded. Waste is waste, regardless of the identity of the one committing it.

As I read the record, the contentions of the plaintiff and the defendant city, who are the only parties to the appeal, range the entire field of conflicting claims in and to waters of the Tuolumne River and its tributaries, and require a declaration of the rights of each of them. Both sought this adjudication in the court below. Plaintiff, by its pleading, asserted rights as a riparian and also as an appropriator, asked for a declaration of those rights, that its title thereto be quieted, and that invasion thereof be enjoined. Complaint was particularly made of threatened diversions of water by the defendant city to points outside of the watersheds of the streams in question.

By its answer the city admitted the contemplated use but denied that it would violate the plaintiff's rights. It also set up seventeen separate defenses based upon claims by appropriation, prescription, intervention of public use (without offer to pay for any taking), bar by the statute of limitations and estoppel, concluding with a prayer for declaration of its rights and the quieting of title thereto as against the plaintiff.

Upon trial of the cause all issues between plaintiff and the city were heard and determined, and a decree was entered determining (1) that the plaintiff, a riparian owner, is entitled, as against the city and subject only to its prescriptive right, to certain water; (2) that the city may not store any of the water of the Tuolumne or its tributaries except "surplus high waters" to a stated amount, and to the capacity of reservoirs as existing at the time of the commencement of the action; and (3) that the city may not divert from the Tuolumne watershed to San Francisco or adjacent territory

at a rate in excess of 142,000,000 gallons daily, or sell or dispose of any water so conveyed for any purpose other than domestic or municipal use.

The uncontradicted evidence presented by the city in behalf of its pleaded claim to a water right shows that the maximum amount which it can put to a reasonable or any beneficial use, until at least the year 1950, is 60,000,000 gallons continuous flow per day. Notwithstanding this evidence, the decision of my associates is, in effect, that regardless of a constitutional mandate prohibiting the waste of water, the trial court may not by any decree to be entered in this action, prohibit the city from diverting and transporting from the Tuolumne watershed an unlimited quantity of water which can be put to no beneficial use. It is of no moment, my associates hold, that such action may lower the water levels in the San Joaquin Valley and deprive vast areas of land of needed moisture.

Such a conclusion, I am confident, violates all legal principles. In the first place, appropriations of water have always been limited to the amount which could be put to beneficial use. This was true long prior to enactment of the constitutional amendment of 1928. ''The early cases measured the appropriator's right by the capacity of his ditch, but that rule has long since been repudiated in this state. (*Smith* v. *Hawkins,* 120 Cal. 86 [52 Pac. 139].) As the pressure of population has led to the attempt to bring under cultivation more and more lands, and as the demands for water to irrigate these lands have become more and more pressing, this court has become increasingly emphatic in limiting the appropriator to the quantity reasonably necessary for beneficial uses. (*Senior* v. *Anderson,* 115 Cal. 496 [47 Pac. 454]; Id; 130 Cal. 290 [62 Pac. 563]; *California P. & A. Co.* v. *Madera Canal & Irr. Co.,* 167 Cal. 78 [138 Pac. 718]; *Northern California Power Co.* v. *Flood,* 186 Cal. 301 [199 Pac. 315]; *Oliver* v. *Robnett,* 190 Cal. 51 [210 Pac. 408]; *Pabst* v. *Finmand,* 190 Cal. 124 [211 Pac. 11]; *Eden Township Water Dist.* v. *Hayward,* 218 Cal. 634 [24 Pac. (2d) 492].) If the appropriator uses more than the amount so required he gains no right thereto. An excessive diversion of water for any purpose cannot be regarded as a diversion for a beneficial use. In so far as the diversion exceeds the amount reasonably necessary for beneficial pur-

poses, it is contrary to the policy of the law and is a taking without right and confers no title, no matter for how long continued. (*Joerger* v. *Pacific Gas & Elec. Co.*, 207 Cal. 8 [276 Pac. 1017]; *Big Rock Mutual Water Co.* v. *Valyermo Ranch Co.*, 78 Cal. App. 266 [248 Pac. 264].) In determining what is a reasonable quantity for beneficial uses, it is the policy of the state to require within reasonable limits the highest and greatest duty for the waters of the state. (*California P. & A. Co.* v. *Madera Canal & Irr. Co., supra.*)" (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal. (2d) 489, at p. 547 [45 Pac. (2d) 972].)

Prior to the constitutional amendment of 1928, a riparian was entitled to the full flow of the stream as against a subsequent appropriator (*Lux* v. *Haggin*, 69 Cal. 255 [4 Pac. 919, 10 Pac. 674]; *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607], and cases there cited). Since the amendment, however, the riparian has been limited to a reasonable beneficial use as against an appropriator who also takes for a reasonable beneficial use. (*Gin S. Chow* v. *City of Santa Barbara*, 217 Cal. 673 [22 Pac. (2d) 5]; *Peabody* v. *City of Vallejo*, 2 Cal. (2d) 351 [40 Pac. (2d) 486]; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra.*) But as between a riparian and an appropriator, this is the full extent of the limitation on the riparian right; it applies only as against water appropriated for a reasonable beneficial use. As against a subsequent taking of water, in excess of that which can be reasonably used by the appropriator, the riparian is entitled to the full flow of the stream. In other words, the constitutional limitation upon the riparian right is not an absolute one; it is relative, in that it only applies as against a subordinate reasonable beneficial use. After satisfaction of the subordinate right, the paramount right to whatever flow is left in the stream remains in the riparian. Thus, if an excess amount of water exists over the reasonable beneficial needs of both the riparian and a subsequent appropriator, then such excess is a property right of the riparian.

This interpretation of the nature of the riparian right as restricted by the constitutional amendment adopted in 1928 (art. XIV, sec. 3) is in exact accord with the purpose and intent of that enactment, which reads: "It is hereby declared that because of the conditions prevailing in this state the general welfare requires that the water resources of the state

be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or watercourse attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled . . . ''.

The new enactment, which has been upheld as being within the police power, limits the right of the riparian; it takes from him a property right, the right to insist on the full flow of the stream even though he cannot use the water beneficially and others might put it to beneficial use. In other words, by the amendment a right is taken from the riparian and conferred on the subsequent taker. If there is no subsequent taker who can put the water to a reasonable beneficial use, then the riparian right remains unimpaired.

This is the only reasonable construction of the amendment. In a contest between a riparian and a subsequent appropriator, where the appropriator cannot put the excess flow to a reasonable beneficial use, it cannot be held to be a ''waste'' of water by the riparian to insist that such excess remain in the watershed until (but only until) some other user can put it to a reasonable beneficial use.

Furthermore, assuming that the views of the majority are correct, a duty still rests upon the trial court to include in its decree a provision restraining the waste of water by the city through the diversion of a flow in excess of that which can be put to a beneficial use. If, by virtue of the constitu-

tional amendment, the water remaining in the stream, after satisfaction of riparian needs and the city's subordinate taking for beneficial use, is not a property right of the riparian, but is a vast natural resource, "excess", or free water of anomalous ownership to be controlled by the state in the exercise of its police power, this court should not approve a decree which grants the city affirmative relief without first requiring that its claims to water be asserted in good faith and for a beneficial use.

The city asked for a declaration of its rights prior and subordinate to those of plaintiff. Under established principles, a prerequisite to procurement of such relief is the exercise of good faith, which, in the present case, means an intention to take the water for a beneficial use. That intention must be *bona fide* and not for speculation, such as to store water for monopoly, or to divert it through an aqueduct and allow it to run to waste in the expectation that customers may be found who will use it at some future time. (Wiel, 3d ed., vol. 1, pp. 406, 407; Farnham, Water and Water Rights, vol. 1, p. 787; *Turner* v. *East Side Canal etc. Co.*, 169 Cal. 652, 657, 658 [147 Pac. 579].)

The principles which find expression in the maxims of equity are simple and fundamental and they are applicable to the state and a city as well as to an individual. Where the subject of litigation is a matter of great public interest, it is paramount that they be invoked. Thus, a proposed waste of water by a litigant precludes him from seeking the aid of a court of equity, which will never declare a right or aid the accomplishment of a purpose violative of law or public policy. Indeed, if an exercise of jurisdiction will be prejudicial to public interest, the court may refuse to protect the private right unless it can also protect the public right. It is also a general principle that the right of appropriation must be exercised with regard to the rights of the public; it is not unrestricted but must be exercised with reference to the general condition of the country and the necessities of the people, and not in such manner as to deprive a whole neighborhood or community of its use and vest absolute monopoly in a single individual. (*Schodde* v. *Twin Falls Land & Water Co.*, 224 U. S. 107, 121 [32 Sup. Ct. 470, 56 L. Ed. 686]; Wiel, Harvard Law Review, vol. 47, p. 436.)

The evidence establishes conclusively that if the city proceeds at this time to carry out its enlarged storage and pres-

ent diversion plan, it will store and take water which it does not need and which it cannot use beneficially within any estimated future period. The amounts of water which the city will be able to put to reasonable beneficial uses and the extent of its present and possible future requirements are shown by uncontradicted evidence. It appears that when the Hetch Hetchy project was initiated, the city proposed to supply water to the entire San Francisco Bay area, including the east bay region up to Richmond. For the purpose of serving this large area an ultimate diversion of 400,000,000 gallons a day was proposed. But in 1923 or 1924, the East Bay Municipal Utility District undertook to supply the east bay territory with water from the Mokelumne River, and that project was completed about 1928. It brings water to the cities of Oakland, Berkeley, Alameda and Richmond. However, the city took no steps to reduce the size of its own project. It proceeded and is proceeding to completion of the project to the extent originally planned and one division of its aqueduct has been built, as originally designed, for a capacity of 420,000,000 gallons a day.

The water which the city proposes to divert will, so far as this record shows, be used with the local supply for the City and County of San Francisco and a portion of the county of San Mateo. The trial court found that there is no other need, or place of use, for water transported through the city's aqueduct. The court also found that the present and future inhabitants of that territory will not require Hetch Hetchy water for domestic, municipal, or other reasonable beneficial use, to the extent of a continuous flow of 60,000,000 gallons per day until after the year 1950, or to the extent of 142,000,000 gallons per day until after the year 1980, and will not require any greater extent of continuous flow ''within any time which can now be ascertained, predicted or estimated.'' These findings are fully supported by the evidence.

Mr. George A. Elliott, the city's expert witness, testified in detail as to the present and probable future needs of San Francisco and adjacent territory for water to augment the local supply. He forecast the growth of population of this area over a series of years, beginning with 1930 and thence forward at ten year intervals up to 1980. He also estimated the available supply of water from local or nearby sources then in use. Taking the estimates of population growth,

with estimates of per capita consumption of water, he arrived at a series of figures of water requirements of the population to be served at each of the ten-year periods. He made two estimates of future growth of population, one on a higher and one on a lower rate of growth, and determined the consumptive uses of water in the area on each of these two bases. After allowing for local supply, he estimated that at the lower rate of population growth, the amount of water from the Hetch Hetchy project which the city would require for succeeding ten-year periods, would be as follows:

| Year | Water in terms of million gallons daily |
|------|------------------------------------------|
| 1940 | 22 |
| 1950 | 45 |
| 1960 | 65 |
| 1970 | 86 |
| 1980 | 107 |

At the higher rate of estimated population growth, his figures are:

| Year | Water in terms of million gallons daily |
|------|------------------------------------------|
| 1940 | 27 |
| 1950 | 57 |
| 1960 | 81 |
| 1970 | 110 |
| 1980 | 139 |

When he was examined upon these figures, Mr. Elliott was asked: "Now, you notice in your project the population and the total consumption, that you have stopped 50 years hence, approximately. Have you endeavored to make any figures beyond 50 years from date?" He replied: "It took almost all of the nerve I had to go that far ahead, Mr. Holm. You are hardly justified in going much beyond that, because there are so many things that may enter into it you can't foresee at all."

Although the highest estimated requirement of the territory to be served will not reach 27,000,000 gallons per day until the year 1940, nevertheless the city, upon the completion of its aqueduct subsequent to commencement of this action, started to divert to San Francisco water to the full present capacity of the pipeline, that is, at the rate of 60,000,000 gallons of water per day. The record contains no showing of any possible use for this surplus amount of water which the city is now diverting. In a controversy between a ripa-

rian and an appropriator. asserting subordinate rights, the appropriator may only be allowed the quantity of water he can put to a reasonable beneficial use, and the burden of proof is upon him to show the extent of such use.

The present storage facilities of the city, according to the evidence, will provide a draft of 142,000,000 gallons of water daily. The city, in its amended answer filed in April, 1933, pleaded that it had no intention of increasing those facilities for a period of 50 years. Nevertheless, to further the public works program of the federal government, the city thereafter undertook the raising of the O'Shaughnessy Dam at Hetch Hetchy reservoir and, in April, 1934, filed amendments to its answer to enable it to claim the right to the additional storage and diversion which such enlargement should provide. There was no need for this development, so far as this record shows. The city claims that it will be able to generate more electric power, but it does not state what use can be found for the additional amount.

The fact that the city has undertaken extensive development work and has already expended many millions of dollars, does not of itself confer a right to water in excess of that which can be put to reasonable beneficial use. The only way in which the city can have the full benefit of its project is to so proceed that construction keeps pace with but does not outrun the actual need for water, and this was the original plan. It is, of course, proper in developing a water system to anticipate the future growth of a community and to provide for its increasing need of water, and the courts have been liberal in including within a declaration of present necessity for the taking of water, the immediate future need of the territory to be served. But this does not mean that water which will not be needed for many years, if ever, may be taken by a municipality and then allowed to run to waste in the expectation that customers may be found who will use it at some future time. (Sec. 1416, Civ. Code; sec. 20, Water Commission Act; *Spring Valley Water Works* v. *Drinkhouse*, 92 Cal. 528 [28 Pac. 681]; *Turner* v. *East Side Canal etc. Co.*, *supra*; *Eden Township* v. *Hayward*, *supra*; *Lindblom* v. *Round Valley Water Co.*, 178 Cal. 450 [173 Pac. 994].) Such an excess taking is without right regardless of how long continued; it can confer no title and will receive no protection. (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, *supra*.)

Although storage for purposes of flood control is a beneficial use of water, the record in the present case contains no evidence whatsoever concerning floods on the San Joaquin River or any action by the state in regard thereto. The city made no claim that its project was planned for flood control purposes; its works, other than those for power purposes, have been built as a project to carry the water beyond the watershed. What may properly be done to control flood waters is, therefore, not an issue in the case.

If these conclusions be correct, then in this action the city should be limited to a decree which declares the extent of its prescriptive and appropriative rights, both of which rest upon the requirement of beneficial use. In order to define these rights, certain facts in addition to those stated in the opinion of my associates should here be noted.

The dispute is over the right to water in the future, not for use at the present time. When the action was tried there had been no diversion by the city outside of the watershed, and admittedly the plaintiff had suffered no damage. Another notable feature is that claims to water of the San Joaquin River intrude upon the issues only because the lands of plaintiff, and also those of defendant West Stanislaus district, border the westerly bank of that river not far from the point of its confluence with the Tuolumne. But the flow of the San Joaquin through this area consists largely, and during several months of the year almost entirely, of water added to it by the Tuolumne. The lands served by the Modesto, Waterford, and Turlock districts lie in the San Joaquin Valley and border both banks of the Tuolumne extending upstream from a place just above its discharge into the San Joaquin. The power plants, reservoirs, works and properties of the city are located in the high mountains. So it is that before reaching the lands of plaintiff, the waters of the Tuolumne and its tributaries pass through the reservoirs and power plants of the city, travel some 120 miles or more downstream, pass through the reservoirs and works of the Waterford, Turlock and Modesto districts, and discharge into the San Joaquin, from whence they are taken into plaintiff's pumping plant.

The distance between the works of the city and plaintiff's land, and the intervening operations to which the water is subjected, are factors which added to the problem of formulating a proper and workable decree. However, the evidence

adduced upon the trial was substantially without conflict. It consisted, in the main, of a great volume of statistical data, water records, engineering records, soil records, and maps, prepared under agreement between the parties, checked by both sides prior to the time of trial, and admitted practically without objection or contradiction.

This evidence shows that by reason of the districts' taking of water, and particularly as a result of the method by which they use it, the flow of the San Joaquin past plaintiff's land is different than it would otherwise be. Among other causes for this is the practice of the districts to fill the Don Pedro reservoir early in each year for the purpose of assuring a supply of water for irrigation. If, later in the year, it is found that some of the water stored will not be required for irrigation, the excess is released and used for the generation of electric power. The result of this method of operation has been to increase and equate the amount of water reaching plaintiff's ranch during the low water period. Another important factor resulting from the districts' intervening use is the large volume of return flow described in the majority opinion.

The claims of the city go back to the year 1901, when its project was initiated. Owing to difficulties in securing the right from the United States to use Hetch Hetchy Valley for a reservoir site and to occupy other public lands, the commencement of actual construction work was long delayed. The Congressional Act of December 19, 1913 (38 Stat. 242), known as the Raker Act, by which the city was finally enabled to proceed, requires the city to recognize:

(1) The prior rights of the Modesto and Turlock districts, as constituted or as said districts may be enlarged to contain in the aggregate not to exceed 300,000 acres of land, to receive 2,350 second-feet of the natural flow of the Tuolumne River, measured at the La Grange Dam, whenever the same can be beneficially used by said districts, and that the city shall never interfere with said rights; and

(2) The rights of those districts to the extent of 4,000 second-feet of water out of the natural daily flow of the Tuolumne River for combined direct use and collection in such storage reservoirs as may be provided by them during the sixty-day period immediately following and including April 15th of each year. *A further provision is that the city shall not divert beyond the limits of the San Joaquin Valley any*

*more of the waters of the Tuolumne watershed than, together with the waters which it has or may acquire, shall be necessary for its beneficial use for domestic and other municipal purposes.*

Subsequent to passage of the Raker Act the city diligently proceeded with its project. At the date of trial of this case it had expended approximately $76,000,000 for the construction of vast works, and about $12,600,000 for interest during time of construction. Prior to and at the commencement of this action, all water used by the city in operating its power plants, was discharged into the bed of the Tuolumne; none of it was conveyed away from the plaintiff's riparian lands. Also, all water released from the reservoirs of the city again flowed in the bed of the Tuolumne, or one of its tributaries, and was available for use by plaintiff and the districts.

However, before the plaintiff filed its suit the city had constructed dams and other works for the diversion of water at Early Intake on the Tuolumne below its two storage reservoirs. The city had also constructed portions of the Hetch Hetchy aqueduct, which was designed for the conveyance of water diverted at Early Intake to San Francisco and adjacent territory. The portion of this aqueduct extending from Early Intake to the Moccasin power house, approximately 20 miles in length and having a capacity in excess of 620 cubic feet of water per second (400,000,000 gallons daily), was completed in June, 1925, and was in use before the suit was started. The portion extending from Moccasin power house to its terminus near San Francisco, was not completed or in use prior to commencement of this action, or for more than two years thereafter. By means of its aqueduct the city is able to convey water a distance of over 100 miles for use outside the watersheds of the Tuolumne and San Joaquin Rivers and their tributaries.

The trial court found that the city's intention to store and divert water was a matter of common and general notoriety, known by plaintiff and its predecessors at least as early as 1924, in which year the city purchased two strips of plaintiff's riparian land to be used for construction and operation of its power transmission lines and Hetch Hetchy aqueduct; that neither plaintiff nor its predecessors made any objection to the city's proposed operations prior to June 24, 1931, but

permitted the city to expend large sums for construction work. However, on June 24, 1931, and again on October 2, 1931, plaintiff notified the city in writing that it would seek injunctive relief against any attempted diversion of water which would in any manner decrease the flow of the Tuolumne past plaintiff's lands. Notwithstanding these notices and the pendency of this action, the city proceeded to complete construction of the Hetch Hetchy aqueduct and, in October, 1934, commenced the diversion of water to San Francisco at the rate of 60,000,000 gallons daily. The court further found that although the city intended as part of its ultimate plan to increase the capacity of its aqueduct to permit a total ultimate diversion of 400,000,000 gallons daily and to enlarge its storage facilities accordingly, at the time this action was commenced and at the time of filing its amended answer in April, 1933, no change in the then existing facilities was contemplated for at least 25 years; that notwithstanding this fact the city now intends to enlarge O'Shaughnessy Dam so as to increase the storage capacity of Hetch Hetchy reservoir from 206,000 acre-feet of water to 357,000 acre-feet, and intends to store additional quantities of water therein, and to use that water for both power purposes, and diversion to San Francisco.

Other findings of the court are that the city had at no time claimed the right to store waters other than waters in excess of the prior rights of the Turlock and Modesto districts (as mentioned in the Raker Act), and in addition thereto, in excess of a continuous flow of 66 cubic feet per second, to which the city has always conceded that these districts and the Waterford district have a prior and superior right. In its findings the court referred to the waters out of which the city could store without invading these prior rights as "surplus high waters", and, defined that term as follows: "The waters flowing at any time in the Tuolumne river and its tributaries above the La Grange dam over and above a flow of 4066 cu. ft. of water per second of the natural daily flow of the Tuolumne river, measured at the La Grange dam, during the period of sixty (60) days immediately following and including April 15th of each year, and in excess of a like flow of 2416 cu. ft. of water per second, measured at the La Grange dam, at all other times." It found that while there are at times "surplus high waters" of the Tuolumne, not reasonably

required for use or beneficial purposes upon plaintiff's riparian lands, which run unused into San Francisco Bay, that, except for return flow, the entire natural flow of the Tuolumne and San Joaquin Rivers during times other than times of high water, is taken and reasonably and beneficially used for irrigation purposes.

On the question of storage the court found that prior to commencement of this action the city had openly, notoriously, and adversely to plaintiff and its predecessors, and under a claim of right (1) stored in Hetch Hetchy and Lake Eleanor reservoirs, out of "surplus high waters", 235,465 acre-feet of water per seasonal year, extending from October 1st of each year to and including September 30th of the next year; (2) stored in Hetch Hetchy in a single seasonal year of maximum storage, but not for five consecutive years, up to 211,300 acre-feet, and in Lake Eleanor up to 36,700 acre-feet; (3) applied such waters to the reasonable beneficial use of generation of hydro-electric power; and (4) returned all waters so stored and used to the Tuolumne at a point above all the works of the districts and the lands of plaintiff.

Concerning diversion, the court found that many years before this action was commenced the city had announced to the public its intention to convey waters previously stored by it to San Francisco and adjacent territory for domestic and municipal uses; that the maximum continuous flow which the city would be able to obtain for such diversion by use of existing storage facilities and without disregarding the prior recognized rights of defendant districts, was 142,000,000 gallons per day; that "such continuous flow of 142,000,000 gallons per day could not be obtained except by the storage of waters other than surplus high waters . . . and by obtaining 32% of such flow through the diversion of waters other than those previously stored. . . . "

The court also found that all waters diverted by the city will be required for use, and used, only within the City and County of San Francisco and a portion of the county of San Mateo; that the present and future inhabitants of this combined territory will not require that water, for domestic and municipal and other reasonable beneficial uses, to the extent of a continuous flow of 60,000,000 gallons per day until after the year 1950, or to the extent of 142,000,000 gallons per day until after the year 1980, and will not require any greater

extent than 142,000,000 gallons per day, or any waters which could be provided by the enlargement of the city's existing reservoirs or by the construction of additional reservoirs, "within any time which can now be ascertained, predicted or estimated".

The only rights of the city superior to those of the plaintiff are such as it acquired by prescription. Concededly, as against plaintiff, the city's prescriptive right to store extends to the quantities of water which for five consecutive years prior to commencement of this action it stored openly, notoriously, continuously, adversely to plaintiff and under a claim of right for power purposes. However, the city has contended throughout that the evidence not only establishes its prescriptive right to store water for the generation of electric power, but also a prescriptive right to divert the stored water for consumptive use without the watershed. It argues that the rights of a lower riparian attach only to the natural flow of the stream; that they do not attach to waters released from upper storage as against the appropriator who has stored such waters; that stored waters are the personal property of the storer as long as he retains possession of them; that they are thereafter subject to his executive control, and he may release them from the reservoir, and conduct them through the natural stream channel to points of diversion and conveyance to place of use.

This argument overlooks the precise question at issue, which is not whether any rights of the lower riparian attached to waters released from upper storage into the stream channel during the prescriptive period, but the extent of the prescriptive right of the city as against the plaintiff. It is elementary that a prescriptive right to the use of water is created by a continuous invasion of the right of the servient owner and must be measured by the extent of the invasion. Thus, in the case of an unauthorized interference with the flow of a stream, the riparian owner, by permitting the interference to go unchallenged for five years, loses the right to complain of it, but he does not lose the right to object to any greater, other, or more injurious interference than that to which he has been subjected. Prescriptive rights are *stricti juris* and may not be extended beyond the actual user (*Scott* v. *Fruit Growers Supply Co.*, 202 Cal. 47 [258 Pac. 1095]; *Eden Township* v. *City of Hayward, supra*).

Thus the measure of the city's prescriptive right as against plaintiff is the extent to which its taking has interfered with the flow of water coming down to plaintiff's riparian land. As the city, over the prescriptive period, has not abstracted or made consumptive use of any water, the total amount which has passed plaintiff's property in any one year has not been decreased, but the seasonal flow has been changed. In my judgment, the extent of this alteration of flow measures the extent of the city's prescriptive right as against plaintiff; that is, the city, by storing the waters, making beneficial use of them for production of power, and then releasing them, altering the flow of the stream but not depleting it in total annual amount, has acquired a prescriptive right to so store, use, and release those waters, but has acquired no other right. Incidentally, this adverse use by the city has conferred no right upon plaintiff to insist upon a continuance of the alteration of the stream flow past its property, or to claim any permanent benefit therefrom, such as, for example, no right to require the city to discharge water into the stream during periods in which there would, without storage, be no natural flow (*Lindblom* v. *Round Valley Water Co., supra*).

The city's reliance upon the principle that "stored waters are the property of the storer" should not avail it here. The general application of that principle is with respect to waters severed from the stream and held in artificial structures. A number of the authorities cited by the city refer to ownership of specific amounts of water so held at particular times, with ownership limited to the period the water is held in possession; they refer to ownership of the water itself after impounding, which is personal property, as distinguished from a water right. As already stated, the question here is not who has in the past owned the waters actually impounded and released by the city, but is what right the city has with reference to such waters in future and for diversion from the watershed.

That the act of impounding water and using it to generate electric power does not confer rights to the extent claimed by the city is plain. Suppose the city undertook merely to store water continuously without using it beneficially. As storage of water in a reservoir is not in itself a beneficial use (*Lindblom* v. *Round Valley Water Co., supra*) but is a mere means of applying the water to such use, storage alone will not ripen

into a prescriptive right of any character, but constitutes an "unreasonable use" of water forbidden by the constitutional amendment of 1928. It follows that storage of water and its use to a particular extent for a certain purpose will create a right to the extent of the use, but not to any greater use. In other words, there must be a beneficial use of water in order to create a right by prescription, and the extent of such use and the manner of its exercise, is the measure of the prescriptive right. Thus, a temporary use of water and its return into the stream channel can never ripen into a prescriptive right of permanent diversion.

In this case the extent of the beneficial use made by the city of the stored water during the prescriptive period was for the generation of electric power, with return of the water thereafter to the stream channel, and that extent of use is the measure, and the limit of the measure, of the city's prescriptive right. It includes the right to store water, use it for the generation of electric power, and then return it to the stream above plaintiff's land. It does not include diversion of water, which would constitute an additional and distinct invasion of plaintiff's right, not exercised over the prescriptive period. It is immaterial that the city *claimed* the right to divert over that period, for it did not in fact actually divert any water. Where there is no exercise of a beneficial use, no prescriptive right is acquired.

The only right of the city prior to plaintiff's riparian right to sufficient water to satisfy its present and future reasonable demands is the prescriptive right which has been discussed. The city, an appropriator, claims the further right, subordinate to plaintiff's right, to store and take any or all of the water remaining in the Tuolumne River and its tributaries. So long as it does not injure plaintiff, says the city, plaintiff has no right to enjoin or limit it in the full exercise of this subordinate right. This statement is correct only in so far as it pertains to that portion of the remaining water which the city actually requires for reasonable beneficial use.

In addition to the reasons which have already been given for limiting the city's taking to water which it can use, the particular facts of this case, especially those bearing on the subject of pollution, show a further right in the plaintiff, as against the city's proposed waste, to have the waters of the stream flow past its land. The evidence shows that the city's

diversion will affect the quality of the flow available to plaintiff. The water which passes plaintiff's land includes return flow which has become polluted with alkalis and other chemical substances. Water containing such substances in sufficient concentration is unfit for irrigation use and is harmful to lands, trees, and crops.

Plaintiff's riparian lands are composed of a heavy soil which affords no drainage through percolation to the underlying water table. The effect of irrigating such lands with impregnated water is to produce a cumulative concentration of harmful substances in the soil of the area irrigated. Plaintiff's representative testified that for a number of years it has contended with a tightness or impenetrability of the soil caused by irrigation. Among other things, this witness stated: "That was a very puzzling and dismaying thing, and during '25 and '26 and '27, we carried on careful investigation to find how to correct this increasingly bad situation. We then began our method of making moisture tests . . . and we found that gypsum, if applied to these soils, made them friable. That really was the major solution to our problem and we made a general application of gypsum over the whole ranch, thousands and thousands of tons, in '28. We also found that that was helped by the growing of cover crops and today, in every one of our areas, we put in cover crops which called for added quantities of water, by the way, because they need an irrigation in the fall to bring them up, and we plow them under the following March."

Expert testimony was adduced by both sides concerning the present and possible future effect of pollution upon plaintiff's lands. Although this evidence was not without conflict, it affords strong support for the contentions of plaintiff and the findings of the trial court. Soil expert Twining, being asked, "What is the effect of a concentration of those substances in the water?," replied: "In sufficient concentrates, they will prevent the growth of practically any cultivated crop; in sufficient amounts they will prevent the growth of any vegetation and of course, lesser amounts will affect according to the concentration. Q. Have they any effect in greater concentration upon the ability of water to permeate the soil? A. Yes . . . the chlorides, particularly chloride of sodium, going into the soil by means of water, will produce deflocculation or make the soil sticky and eventually will be

impervious to water." Mr. Twining stated that he had made successive analyses of the waters of the San Joaquin and its tributaries and had found that "as the years pass by, and as the water goes . . . farther down the river . . . there has been a progressive increase in the salinity or alkalinity, as we term it, in the water of the San Joaquin, as demonstrated by analyses I have taken over a period from 1910 to 1933 inclusive. Q. And has that gone side by side with an increase in the area upon which water is applied? A. Yes . . . in the first place, there has been a lessening of the flow and there is a certain amount of drainage water carrying more salt that goes back into the river. . . . The fresher the water, the better it is, and using saline waters, it is necessary to use more water in order to prevent surface accumulation. Of course, there is a limit to the amount of salinity in a water that can be used. . . . Soils . . . that are readily drained, can use much more saline water, that is, water with higher alkaline or salinity. . . . If the land drains, the water goes through and carries the salts with it. . . . Water applied on the soils, heavy type soils on the El Solyo ranch, the water doesn't drain off or drain through the soil, and therefore any amount of salinity is cumulative. . . . Q. What is the effect upon the water in a river of reducing the proportion of fresh water in it as compared with drainage water that has passed through land in the course of irrigation? A. The fresh water, of course, dilutes your river water and decreases the salinity, the total salinity, and of course would be better water and the more you reduce the addition of fresh water, the more dangerous the water becomes for irrigation purposes."

The trial court found that the return flow in the Tuolumne has not in the past contained a sufficient concentration of salts, alkalis, and other chemical substances to render it unfit for irrigation use on plaintiff's riparian lands; that except at times of very low flow the impregnated or polluted water resulting from seepage return after irrigation and forming a part of the flow available for use upon plaintiff's riparian lands has been commingled with and diluted by fresh or unpolluted water flowing in the Tuolumne or released into the stream by defendants. But the court also found that if the city should carry away from the Tuolumne a part of the flow of fresh water which has hitherto come down the river, or if the districts should so change their methods of diversion, stor-

age, and use of waters of the Tuolumne as to reduce the proportion of fresh or relatively unpolluted water forming a part of the flow available to plaintiff, then the impregnation with harmful substances and the pollution of such flow, and the frequency and duration of periods of pollution would be increased.

It is manifest from the evidence and from the findings that any taking of fresh water from the stream will affect the quality of the remaining flow. It is true that the trial court afforded plaintiff protection against pollution by decreeing that plaintiff's riparian right for reasonable beneficial uses was a right to water not only sufficient in quantity but also of a quality fit for irrigation, and the court also retained jurisdiction so that if in the future the water available to plaintiff becomes polluted to an extent which makes it unfit for use, then the court, in the exercise of its retained jurisdiction, may make such further findings and decree as the facts warrant.

But even this relief, under the rules herein declared, does not afford plaintiff the full protection of its riparian right. As against a subsequent appropriator's taking of water for a reasonable beneficial use, the riparian's right is satisfied if it receives its full entitlement of water of a quality fit for its proposed use, but as against a subsequent appropriator's proposed taking of water in excess of the amount which is needed and can be beneficially used, the riparian is entitled to have such excess left in the stream bed for enrichment and purification of the flow. In other words, even under the limitation imposed by the constitutional amendment, the riparian is entitled to water of the highest quality which the stream will normally afford if that entitlement can be obtained without invasion of subordinate rights to the taking of water for reasonable uses.

The appropriative rights of plaintiff and the city and their respective priorities rest upon the same basis, that is to say, neither may acquire or perfect a right to more water than can be put to a reasonable beneficial use. Plaintiff pleaded an appropriative right separate from and independent of its riparian right, with priority as of October 10, 1919, over any claim of the city, and prayed that its title thereto be quieted. In answer to that count the city alleged that it owned forty-seven separate and distinct appropriations of water in connec-

tion with the Hetch Hetchy project and that any appropriative right claimed by plaintiff was acquired subsequent to its appropriative rights; hence that title to those rights should be quieted against plaintiff. As a separate defense directed to the second cause of action, the city alleged its plan for the ultimate development of the Hetch Hetchy project, and alleged that it owned the right, as against any appropriative right of plaintiff, to appropriate, detain, and store for future use for the development of power for domestic and municipal purposes in the City and County of San Francisco and adjacent territory, sufficient water of the Tuolumne and its tributaries to allow diversion by it of a constant flow of 400,000,000 gallons of water daily.

By these pleadings, the sole issue presented is the priorities of the respective appropriative rights alleged by plaintiff and the city. Plaintiff asked no affirmative relief against the city. The city claimed no prescriptive right against plaintiff's appropriation. Admittedly, the city's operations had never interfered with plaintiff's diversion of water to the full extent of its appropriation. Admittedly also there was no issue of intervention of the public use. Thus upon trial of the cause, plaintiff and the city each sought to prove priority of appropriative rights.

Plaintiff showed that it was the owner, independently of its riparian right, and subject only to prior rights of the city, of an appropriative right, with priority as of October 10, 1919, to take and divert for beneficial use, waters of the San Joaquin River, at the rate of 46.74 cubic feet per second from March 1st to November 1st of each year, the place of use being limited to 3,781 acres of the ranch, and excluding 540 acres of parcel one thereof lying immediately adjacent to the San Joaquin River and riparian thereto and to the Tuolumne. The court so found and this finding was carried into the decree.

The city introduced in evidence certified copies of notices of forty-seven alleged prior appropriations initiated by it. Eighteen of these notices had been pleaded in abbreviated form in the city's amended answer, and counsel stated that although it was necessary to offer all forty-seven notices in evidence in order to follow their historical sequence, the city would rely only upon the eighteen, which were posted and filed in the years 1901 to 1911.

During that period, which was prior to enactment of the Water Commission Act (Stats. 1913, p. 1012, Deering's Gen. Laws, Act 9091), the appropriation of water was governed by sections 1410 to 1422 of the Civil Code. Section 1414 declared that "as between appropriators, the one first in time is the first in right." Section 1415 provided that a person desiring to appropriate water must post a written notice at the point of intended diversion, stating therein: "1. That he claims the water there flowing to the extent of (giving the number) inches, measured under a four-inch pressure; (2) The purposes for which he claims it, and the place of intended use; (3) The means by which he intends to divert it, and the size of the flume, ditch, pipe, or aqueduct in which he intends to divert it," and the section further provided that a copy of the notice must be recorded within ten days after posting.

Section 1416 (prior to amendment in 1911) provided that within sixty days after posting of the notice, the claimant must commence the excavation or construction of the works in which he intended to divert the water, or survey, road or trail building, necessarily incident thereto, "and must prosecute the work diligently and uninterruptedly to *completion*," provided that if erection of a dam had been recommended by state authorities, the claimant should have sixty days after completion of the dam in which to commence excavation or construction. Section 1417 defined "completion" to mean "conducting the waters to the place of intended use". Section 1418 applied the "doctrine of relation". It provided: "By a compliance with the above rules the claimant's right to the use of the water relates back to the time the notice was posted." Section 1419 stated that "a failure to comply with such rules deprives the claimants of the right to the use of the water as against a subsequent claimant who complies therewith".

Under this method of appropriation, by application of the "doctrine of relation", priority of appropriative right dates from the posting of a notice in the form prescribed by section 1415, provided that subsequent to posting the notice, the claimant diligently prosecutes toward completion the work necessary to diversion and use of the water. However, if there is a lack of due diligence on the claimant's part, a later appropriator who proves that he first completed his

works and actually took and beneficially used the water, has a prior right. (*DeNecochea* v. *Curtis*, 80 Cal. 397, 401 [20 Pac. 563, 22 Pac. 198] ; 26 Cal. Jur., pp. 79, 80, secs. 270, 271.)

In this case the evidence shows that the city's appropriations were the first to be initiated but plaintiff's appropriation was the first to be completed. The city's claimed appropriations were all initiated between 1901 and 1911. Plaintiff's appropriation was initiated on October 10, 1919, and construction of works for diversion of the water was prosecuted with due diligence to completion. On the latter date the city's project was still in the course of construction. It was using only a small amount of water stored in Lake Eleanor to generate power at the Lower Cherry River power house. Its Hetch Hetchy reservoir and Moccasin power house were not finished, and there was no actual diversion of water to San Francisco until 1934, subsequent to the filing of the present action. Applying the ''doctrine of relation'' to this situation the trial court properly concluded that, as plaintiff's valid appropriation antedated any actual use of water by the city, the latter is entitled to priority only for those appropriations which were initiated by the posting of valid notices and followed by the prosecution of construction work with due diligence.

Some of the eighteen notices relied upon by the city were posted by it or its representatives, while others of them were posted by Wm. Ham Hall or by Sierra Ditch and Water Company, who later transferred their rights to the city. The trial court refused to accord the latter appropriations priority, either because there was no proof of transfer to the city or other evidence that the city was the owner thereof, or because the work necessary to diversion and use of the water was not shown to have been prosecuted with due diligence by the city or its predecessors. In its briefs on this appeal the city does not seriously question the sufficiency of the evidence to support these findings, but it states that without considering any of the notices posted by Wm. Ham Hall or Sierra Ditch and Water Company, the remaining notices which were posted by it or its representatives were valid and sufficient to cover allowance of appropriations to the extent claimed by it. Some of the latter notices, the court found, were superseded by

amended ones filed later, and were not separate or additional claims of right.

The city does not question this conclusion. But it contends that the evidence does not support the further findings to the effect that each of the notices relied upon, with the exception of five, fails in some respect to meet the requirements of section 1415, *supra*, or else was not followed by prosecution of development work with due diligence.

To state the city's contention more particularly, the trial court found that the city's notices of appropriation designated 1 (c), 2 (d), 3 (b), 3 (c), and 4 (c) were filed in the form provided by law at a time prior to the initiation of plaintiff's appropriation, and that by virtue of those five appropriations the city is the owner of valid rights, superior in right to plaintiff's appropriative right, to store and divert waters of the Tuolumne and its tributaries at the following places and in the following amounts: (1) To store in Lake Eleanor flows not to exceed 5,000 miner's inches, or 100 cubic feet per second; (2) To store in the Hetch Hetchy reservoir flows not to exceed 35,000 miner's inches, or 700 cubic feet per second; (3) To store in the proposed Cherry Valley reservoir flows not to exceed 25,000 miner's inches, or 500 cubic feet per second, provided said proposed reservoir be completed and put into use with due diligence; (4) To divert into the Hetch Hetchy aqueduct at Early intake flows not to exceed 25,000 miner's inches, or 500 cubic feet per second.

These findings were carried into the decree, which also adjudged that plaintiff's appropriative right is prior to all other claims of the city. The city asserts that valid notices posted by it or its representatives were sufficient to entitle it, as against plaintiff's appropriative right, to priority of appropriation to the following extent: (1) 289,862.9 acre-feet annually to be stored in Lake Eleanor; (2) 345,000 acre-feet annually to be stored in Hetch Hetchy reservoir; (3) 62,408 acre-feet annually to be stored in Cherry Valley reservoir; (4) 620 second-feet to be diverted into the city's aqueduct at Early intake; and (5) 25,000 inches under four-inch pressure to be stored in Poopenaut Valley reservoir.

The earliest notices of appropriation on behalf of the city covering storage in Lake Eleanor and Hetch Hetchy reservoirs were notices 1 (a) and 3 (a), posted by Mayor

Phelan on July 29, 1901, for 5,000 inches of Eleanor Creek below the outlet of Lake Eleanor and 10,000 inches of the Tuolumne River at the outlet of Hetch Hetchy Valley. These notices, the trial court found, were superseded by similar notices 1 (c) and 3 (b) respectively, posted by the city through City Engineer Manson on October 1, 1908, and September 29, 1908.

The latter notices were found to be valid. Also found valid was a further notice, 3 (c), posted by the city on February 18, 1911, for 25,000 inches of the Tuolumne at the outlet of Hetch Hetchy Valley. Upon these three valid notices, the trial court predicated its conclusion that the city was the owner of an appropriative right, prior to and valid against plaintiff's appropriative right, to store in Lake Eleanor not to exceed 5,000 inches (100 cubic feet per second), and to store in Hetch Hetchy reservoir not to exceed 35,000 inches (700 cubic feet per second).

The city claims that the three notices were sufficient to entitle it to a larger diversion, i. e., to the right to divert and store to the full capacity, as enlarged, of Lake Eleanor reservoir site shown on the amended map approved under the Raker Act, 289,862.9 acre-feet, and to the full capacity, as enlarged, of Hetch Hetchy reservoir, 345,000 acre-feet. The city argues that under the code method of appropriation no provision was made for giving notice of diversion for storage; that if an appropriator of water to be stored had specified in his notice the number of inches in the peak flood to be impounded, he would have had to name an amount of water grossly disproportionate to the size of the described diversion ditch; that hence the logical course, and the course followed by the city, was to specify in the notice the amount, corresponding to the capacity of the described ditch, of regulated flow which would be obtained from capacity storage, and then to state as follows: "It is proposed to divert such waters by means of a dam, to allow the same to flow in natural channels, and in canals, tunnels, flumes, wooden and iron or steel pipes to the points of intended use, using such dams and other structures for its recovery from natural channels and its proper control as may be required." In other words, the city contends that under the code method, an appropriation of a specified quantity of water conferred the right to impound and detain not only that quantity but also such addi-

tional water as might be necessary to enable the appropriator to obtain from storage a regulated flow up to the amount stated in his notice of appropriation; that, for example, a notice of appropriation of 5,000 inches conferred the right to divert, impound, and detain several times that amount of water, in order to secure a continuous regulated flow of 5,000 inches out of the reservoir.

This contention should not be sustained. By the express terms of section 1415, *supra*, the first essential of a notice of appropriation was that the appropriator state therein that he claimed "the water there flowing to the extent of (giving the number) inches, measured under a four-inch pressure." The statute contained no intimation that compliance with this clear and definite demand was not just as vital to a valid appropriation for storage as to a valid appropriation for direct diversion, and we are cited to no case which holds that a specified appropriation for storage could not be made. To adopt the view urged by the city would be, in effect, to nullify the express demand of the statute and to overlook one of the primary objects of a notice of appropriation under the code method, which was "to set a limit upon the extent of the water-right claimed, and to preserve evidence thereof by having it recorded." (1 Wiel on Water Rights, 3d ed., sec. 373.) Although the measure of the appropriator's right was neither the amount of water claimed in his notice of appropriation, nor the amount actually diverted, but was the amount necessarily and reasonably used for beneficial purposes, nevertheless the amount claimed in the notice limited the extent of the appropriator's right and fixed the maximum amount of water which could be taken where the benefit of the doctrine of relation was sought. (26 Cal. Jur., secs. 287, 288, p. 94 et seq.)

A notice of appropriation under the code method is to be liberally construed (*Osgood* v. *El Dorado Water & Deep Gravel Min. Co.*, 56 Cal. 571), but nevertheless it must contain the essential data specified in the statute and must conform substantially to its terms. Particularly is this true where the appropriator seeks the benefit of the "doctrine of relation". As it is only by a compliance with the rules laid down in the code that the "claimant's right to the use of the water relates back to the time the notice was posted" (section 1418), where there is involved the priority of an

uncompleted appropriation as against subsequent parties, the question of procedure becomes important (26 Cal. Jur., p. 66, sec. 251; p. 80, sec. 271). The purpose of the provisions prescribing the code method was to define with precision the conditions upon which an appropriator could have the advantage of the ''doctrine of relation'', as against other persons also complying with code requirements. The notice of appropriation, in addition to fixing the date to which the water right related, fixed a limit on the amount of water claimed, and acted as a warning to other persons that there were prior rights in case they wished to use the water pending the accrual of those rights. (*Wells* v. *Mantes,* 99 Cal. 583 [34 Pac. 324]; *DeNecochea* v. *Curtis, supra;* 26 Cal. Jur. sec. 260, p. 72.)

The opinions in the cases last cited imply that one cannot claim the benefit of the ''doctrine of relation'' unless the code provisions have been strictly complied with, and this, I believe, is the correct view. (1 Wiel on Water Rights, 3d ed., sec. 375; *Taylor* v. *Abbott,* 103 Cal. 421 [37 Pac. 408]; *Duckworth* v. *Watsonville Water & Light Co.,* 158 Cal. 206, 211 [110 Pac. 927].) Suppose that several claimants filed notice for given amounts of water to be diverted by means of a dam and each then claimed the right to impound and detain water to an extent sufficient to give a continuous regulated flow from storage up to the amount claimed. If respective claims to that extent were sustained, how could the constitutional requirement to secure the greatest use of the water for all takers be satisfied? It is plain that an appropriator cannot assert an appropriative right through application of the ''doctrine of relation'' to any water in excess of the amount claimed in his notice, nor can a notice, in the form of those here under consideration, be construed to embrace any greater appropriation than the actual amount of water specified therein; that is, a notice claiming 5,000 inches, to be diverted by means of a dam and other structures, conferred no greater maximum right than to divert or store behind a dam such water as needed for beneficial use, up to the amount of 5,000 inches.

The city refers to three alleged notices of appropriation at Eleanor Creek, 1 (b), 1 (d), and 1(e), in addition to those designated 1 (a) and 1 (c) and already discussed. Notice of appropriation 1 (b) was filed on July 20, 1902, by Wm.

Ham Hall for 50,000 miner's inches. The court found that this notice failed to state the place of intended use of the water to be appropriated. Notice of appropriation 1 (d) was filed on November 17, 1909, by Sierra Ditch and Water Company for 5,000 miner's inches. The city, so the court found, failed to prove transfer or ownership of this appropriation. With respect to both appropriations 1 (b) and 1 (d), the court further found that there was a lack of due diligence on the part of the owners in prosecuting development work toward completion. The city does not contest these findings. The remaining appropriation, 1 (e), was filed on February 27, 1911, by the city through City Engineer Manson, and it claimed *"all the water*, natural or stored, here flowing in Eleanor Creek. . . . "

The city contends that even without appropriations 1 (b) and 1 (d), appropriation 1 (e), claiming "all the water" of Eleanor Creek, was sufficient to allow the taking of water to the full capacity of the Lake Eleanor reservoir as enlarged, 289,862.9 acre-feet. The trial court, however, found the notice covering appropriation 1 (e) to be invalid as against plaintiff's appropriation for the reason that it did "not state the amount of water claimed". The city argues that the words "all the water" sufficiently stated the amount of water claimed to satisfy the requirements of section 1415, *supra;* that it served as a declaration of the intention of the appropriator, and as a warning to subsequent appropriators, and that the maximum amount of water which could be claimed under such a notice was limited only by the maximum capacity of the appropriator's works—in this instance, the capacity of enlarged Lake Eleanor reservoir, 289,862.9 acre-feet.

In my judgment this contention cannot be upheld. A sufficient notice of appropriation under the code method must conform substantially to the requirements of section 1415, and must contain a definite statement of the amount of water to be appropriated. A notice claiming "all the water" is nothing more or less than a blanket form of declaration for the taking of as much water as the appropriator can put to beneficial use, and it is equivalent to failing to specify any amount at all. If a claim to "all the water" had satisfied section 1415, what appropriator would not have hastened to

adopt that general form of notice in order to insure the obtaining of the fullest possible quota of water for his proposed use? The trial court properly found, I believe, that the notice covering appropriation 1 (e) was defective in failing to specify the amount of water claimed, and that therefore that appropriation was invalid as against plaintiff's appropriation.

Other appropriative claims are those for storage in Cherry Valley reservoir, five in number, 2 (b), 2 (c), 2 (d), 2 (f), and 2 (g). The city contends that without considering three of these appropriations, 2 (b), 2 (f), and 2 (g), which were made by Wm. Ham Hall and Sierra Ditch and Water Company, either of the remaining two, 2 (c), or 2 (d), was sufficient to cover the appropriation of water to the full capacity of Cherry Valley reservoir as approved, 62,408 acre-feet.

The trial court found appropriation 2 (d), based on a notice filed by the city on February 27, 1911, for 25,000 miner's inches of water, to be valid, and concluded that said notice entitled the city to store in the proposed Cherry Valley reservoir flows not to exceed 25,000 miner's inches (500 cubic feet per second), provided that the proposed reservoir be completed and put into use with due diligence. Apparently the city's contention that either appropriation 2 (d), or appropriation 2 (c), should entitle it to take water to the full capacity of the Cherry Valley reservoir, 62,408 acre-feet, is based upon its theory that notice of taking of a specified amount of water for diversion and storage permits the impounding of a sufficient additional flow to provide a regulated flow out of storage of the amount specified. This theory, in my opinion, is untenable.

Appropriation 2 (c) for 50,000 miner's inches of water was based upon a notice filed for the city by City Engineer Manson on October 24, 1909, recorded November 4, 1909. The trial court found that the notice was defective in that it failed to state the size of the flume, ditch, pipe, or aqueduct by which the claimant intended to divert the water, and that no copy of it was recorded within ten days after posting, as required by section 1415, *supra*. The evidence shows that a copy of this notice was recorded eleven days after posting.

The city urges that under a "liberal construction" of the statute, this was a sufficient compliance. But if this is proper, then who can say where such liberality should cease? For example, would "liberal construction" warrant an extension of five or ten days? It is my view that the stated period of "within ten days" must be held to mean within that time and no other time. To hold otherwise would in effect nullify the clear and unambiguous demand of the statute.

However, the city further urges that the recordation should be held good at least as to those who acquired an interest subsequent thereto and were not injured by the delay. This contention is answered by what has been said with respect to the importance of procedure where there is involved the priority of an uncompleted appropriation as against subsequent parties, and with respect to the duty of an appropriator, who seeks the benefit of the "doctrine of relation", to comply with the rules laid down in the code.

The city also made appropriations on the Tuolumne River at Early intake and it pleaded two, 4 (a) and 4 (c), which it alleged provided for direct diversion at this location. The first, made on October 12, 1909, by Sierra Ditch and Water Company for 12,000 inches, was not shown to have been transferred to the city or to have been prosecuted with due diligence toward completion. The city does not contest the finding to that effect. Appropriation 4 (c), made by the city on February 21, 1911, for 25,000 miner's inches, was found to be based on a valid notice and was held to entitle the city, as against plaintiff's appropriative right, to priority of appropriation to divert into the Hetch Hetchy aqueduct at Early intake flows not to exceed 25,000 miner's inches, or 500 cubic feet per second.

The city plans ultimately to divert to the full capacity of its aqueduct, 31,000 miner's inches or 620 second-feet, and it contends that even without Sierra Ditch and Water Company appropriation 4 (a) it owns appropriations, prior to plaintiff's appropriation, more than sufficient to supply the full contemplated diversion. In this connection the city claims priority for two appropriations on the Tuolumne near the mouth of Jawbone Creek, which two appropriations it inadvertently omitted to describe specifically in its amended answer.

The city's amended answer and amendments thereto alleged: "Defendant now owns forty-seven separate and distinct appropriations on the Tuolumne river and its tributaries in connection with its Hetch Hetchy project. The appropriations of defendant on Eleanor Creek, Cherry River, Tuolumne River at Hetch Hetchy, Tuolumne River at and near Early Intake and Tuolumne River at Poopenaut Reservoir site are as follows (describing briefly eighteen appropriations) . . . " Upon trial of the cause counsel stated that the city would rely only upon the eighteen appropriations expressly pleaded, but that it wished to introduce in evidence exhibit No. 572, containing a copy of notices of all appropriations, in order to show historical sequence. On this statement exhibit No. 572 was admitted without objection by plaintiff. Notices covering the two omitted appropriations appear at pages 68 et seq., and 103 et seq., of the exhibit. The first notice, dated October 4, 1908, was made by City Engineer Manson for 15,000 miner's inches of water; the second, dated February 28, 1911, was made by the city for 25,000 inches.

During the course of the trial the city devoted its entire effort to establishing priority of the eighteen appropriations expressly pleaded and relied upon. It made no attempt to put in issue the validity of appropriations based on notices other than the eighteen which have been mentioned. However, when the cause came on for argument before the trial court, the city tried to rectify its inadvertence and urged its rights under the omitted notices. Plaintiff claims that this effort came too late, and I also take that view.

If, under the city's general allegation of ownership of forty-seven appropriations, the cause had been tried upon the theory that all were relied upon, then it may be that a casual declaration of counsel that he wished to offer exhibit No. 572 for a limited purpose would not have precluded the court, in the absence of any showing of prejudice to plaintiff, from drawing any reasonable deduction from that evidence. (*Isenberg* v. *Sherman*, 214 Cal. 722, 732 [7 Pac. (2d) 1006]; 21 Cal. Jur., sec. 181, p. 260; 10 Cal. Jur., sec. 106, p. 817.) But here the trial was had upon the theory that only the priority against plaintiff of the eighteen appropriations specifically pleaded and expressly relied upon was at issue, and all of the evidence was directed solely to that issue. The

further issue involving other appropriations, first raised by the city in its argument before the trial court, I believe, came too late for consideration. Plaintiff at that time would have had no opportunity to refute, if it could, the validity of the additional appropriations. The city, apparently, did not ask to amend its pleadings to describe those appropriations, nor did it request a finding upon them. Clearly then, upon appeal it is in no position to urge that this court declare their asserted priority.

Lastly, the court is asked to consider the city's appropriation (No. 5) on the Tuolumne at Poopenaut reservoir site, notice of which was filed by the city on February 20, 1911, for 25,000 miner's inches of water. Admittedly the city undertook no construction work subsequent to filing this notice, and it has not yet applied to the Department of Interior for a right of way for reservoir purposes in Poopenaut Valley. The trial court found that the notice was invalid as against plaintiff's appropriation for the reason that the work necessary to diversion and the use of the water sought to be appropriated had not been prosecuted diligently toward completion by the city.

The city recognizes the necessity for diligence, which is of the essence of priority (*Sierra Land & Water Co.* v. *Cain Irr. Co.*, 219 Cal. 82 [25 Pac. (2d) 223]; Wiel on Water Rights, 3d ed., sec. 382 et seq.; 26 Cal. Jur., p. 81, sec. 272 et seq.), but it claims that the trial court failed to give it the benefit of the provision added to section 1416 of the Civil Code by the amendment of 1911 (Stats. 1911, p. 1419) making that section read as follows:

"Within sixty days after the notice is posted, the claimant must commence the . . . works . . . and must prosecute the work diligently and uninterruptedly to completion . . . provided, that whenever any city and county . . . has made . . . any appropriation of any of the waters of this state in accordance with the provisions of section 1415 of this code, it shall not be necessary for such city and county . . . to commence the work for development of more of the water so claimed than is actually necessary for the immediate needs of such city and county . . . and it shall be held to be a sufficient compliance with the requirements of this chapter, to the full amount of water stated in the notice posted and recorded, for such city and county . . . to within sixty

days make the necessary surveys, or within six months to authorize the issuance of municipal bonds, for the construction of the necessary works designed to supply such city and county . . . with the water required for immediate use. Any appropriation heretofore made by any such city and county . . . in connection with which surveys were at any time made, or an issue of bonds authorized for the construction of any portion of the works necessary for a diversion of any part of the water appropriated, is hereby confirmed to the full amount of water stated in the original notice or notices.'' The city claims that under this provision it is not necessary for any city and county which had made an appropriation to commence work for the development of more of the water claimed than is actually necessary for its immediate needs; that in developing the Hetch Hetchy project there is no present need for the construction of the Poopenaut Valley reservoir; that therefore the city's lack of diligence is excusable and will not deny the Poopenaut appropriation priority as of the date of filing notice therefor.

As I read this provision it merely declares that it is not necessary, in the exercise of due diligence, for a city and county to commence development for the *full* amount of water stated in a notice of appropriation, in order to secure priority as of the date of the notice but that it is sufficient to develop *such amount* of water as is necessary for the immediate needs of the municipality. Here, however, apparently the city has not undertaken to develop *any water at all* at the Poopenaut reservoir site, and has not even applied for a right of way for the reservoir, although over twenty-five years have elapsed since the posting of its notice of appropriation in 1911. Furthermore, the evidence in this case shows that the city does not require any of the proposed Poopenaut supply to meet its immediate needs. Moreover, we are not referred to any evidence showing that surveys have been made or bonds authorized for development at this site. Under these circumstances the trial court's finding of lack of due diligence with respect to prosecution of the Poopenaut appropriation was clearly warranted and to hold otherwise would be to do violence to the plain provisions of amended section 1416. The trial court properly concluded, in my judgment, that this appropriation was not entitled to priority as against plaintiff's appropriation.

The decree, as modified by the decision of this court, while purporting to protect plaintiff's riparian right, does not insure the furnishing of water at El Solyo ranch when the stream flow there is insufficient in quantity and quality. It merely enjoins the city, at such times, from diverting at a point some 120 miles upstream. This, in my judgment, does not afford plaintiff the protection to which it is entitled.

The city's works and point of diversion are situated in the high mountains. The Hetch Hetchy reservoir is over 120 miles by stream channel from plaintiff's land. Even if there were no natural or artificial influences between the two locations, it would take more than a day before water released by the city could reach plaintiff's point of diversion. Moreover, there are intervening takers and users who have prior rights.

A provision to prohibit the city from exercising any subordinate right until plaintiff's water entitlement for reasonable requirements has been satisfied, should be appropriately worded to restrain and enjoin the city from storing and using water in excess of its prescriptive rights, or from diverting any water whatsoever to points without the Tuolumne watershed, until it has first ascertained that there is present in the stream flow at plaintiff's point of diversion a sufficient supply of water of suitable quality to permit the taking by plaintiff of its full water entitlement at all times. Under such an adjudication the burden would be upon the city to see that the water is in the stream channel at plaintiff's point of diversion. If this required special releases by the city, it would have to make allowance for the time necessary for the water to reach plaintiff's land, and also to so time its releases with the operations of the districts and intervening users as to insure the water reaching plaintiff's point of diversion under a sufficient head for pumping. In other words, the duty rests upon the city to see that plaintiff's prior rights are satisfied before it proceeds to exercise any of its claimed subordinate rights.

This form of relief would meet the city's argument that account must be taken of the waters of the San Joaquin, and of the return flow past plaintiff's property, for if plaintiff were securing a sufficient suitable supply from these sources, then the city's duty would be met. Indeed, if the evidence in this case and the city's contentions correctly depict the volume of flow in the San Joaquin and the volume

of return flow, the injunctive provision would rest lightly upon the city, because those sources would always make available at plaintiff's plant a supply of suitable water far in excess of its entitlement. The injunction would also afford plaintiff ample protection in the exercise of its riparian right, and in form would satisfy plaintiff's claim that it must be protected against the contingency of an increased future use of water for irrigation by upper riparians along the river, which would lessen both the quantity and quality of the flow past its property.

If, however, for any reason the solution here suggested did not prove sound in present or future actual operation, then the parties, and the trial court under its retained jurisdiction, would have the privilege of working out a more acceptable plan. The city's Hetch Hetchy aqueduct passes over plaintiff's land. Rather than be subjected, now or in future, to the form of injunction above directed, the city might prefer to supply plaintiff with water from its aqueduct. If this plan were adopted, such a delivery should be entirely at the city's expense, even to the installation and operation of the necessary works to make the water available for taking by plaintiff at a point from which it is feasible to use it. Recent decisions in cases of this character have adopted and approved the granting of appropriate relief along these lines. Where the parties themselves have not worked out a plan, or are unwilling to agree upon one, the court has power to make and enforce its own suggestion in the premises. (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra; City of Lodi* v. *East Bay, etc.,* 7 Cal. (2d) 316 [60 Pac. (2d) 439].) It might also take advantage of the aid afforded by the Water Commission Act. (*Wood* v. *Pendola,* 1 Cal. (2d) 435 [35 Pac. (2d) 526] ; *Peabody* v. *City of Vallejo, supra; Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* at p. 575.)

Under all of the circumstances shown in this case, in my opinion, the decree should: (1) Declare the extent of the city's prescriptive rights; (2) Declare the extent of plaintiff's riparian right; (3) Enjoin any exercise by the city of subordinate rights until plaintiff has first received its full water entitlement; (4) Declare the extent of the city's rights which are subordinate to plaintiff's riparian right to water for reasonable needs; (5) Enjoin any storage by the

city in excess of its prescriptive rights until a need for such increased storage is shown; enjoin any diversion by the city from the Tuolumne watershed to San Francisco and adjacent territory of water in excess of the amount which the city can put to a reasonable beneficial use; (6) Provide for retention of jurisdiction by the trial court.

A petition for a rehearing was denied on June 3, 1939, at which time the judgment was modified, and the following opinion then rendered thereon:

THE COURT.—On petition for rehearing the plaintiff calls attention to an obvious omission in the modification of paragraph IV of the judgment. In that paragraph the trial court, among other things, definitely fixed the extent of the city's prescriptive right. The city also suggests a correction to the same effect. The purpose of the suggested or any modification of paragraph IV was and is to retain in the judgment the determination of the trial court with reference to the city's prescriptive right and to eliminate therefrom the restriction against the increased storage by the city within that right. The opinion and judgment of this court is therefore modified by striking therefrom the quoted paragraph following the words "Paragraph IV is modified to read as follows:" (appearing on page 616 of vol. 97, California Decisions), and substituting in lieu thereof the following:

"That the defendant, the City and County of San Francisco, is the owner by prescription of a right, prior and superior to the plaintiff's riparian right, to store in its Lake Eleanor Reservoir and Hetch Hetchy Reservoir the waters, including the excess waters, of the Tuolumne River and its tributaries, up to 234,000 acre feet of water, and no more, at any one time, and up to a total of 235,465 acre feet of water, and no more, in any seasonal year, extending from and including October 1st of any year to and including September 30th of the next succeeding year, and to release the water so stored and use it for the generation of hydroelectric power; provided that when there is not flowing at the plaintiff's land the quantity of water to which it has been found to be entitled, and of a quality substantially unimpaired by any act of the city beyond the exercise of its prescriptive right, the waters so stored and then being used for

power purposes shall be returned after such use to the Tuolumne River at a point above the works of the defendant, Turlock Irrigation District, Modesto Irrigation District and Waterford Irrigation District, and above the lands of the plaintiff.''

It is further urged by the plaintiff that the judgment as modified does not accord to the plaintiff adequate protection of its rights, nor direct a physical solution, and that a rehearing should be granted so that the parties might, after further opportunity for consultation and study, arrive at a permanent agreement to be embodied in a possible stipulated judgment. There is nothing in the judgment as modified herein which would prevent the trial court from providing a physical solution in carrying out the purpose and intent of the judgment, or from making further orders in protecting the rights of the parties. The trial court has safeguarded its jurisdiction in that respect by the reservation contained in paragraph IX of the judgment as follows: ''That the court hereby reserves jurisdiction and authority, at any time, and upon application of any party affected by this judgment and decree, to make such modifications of, or such additions to, the provisions of this judgment, or to make such further orders, as may be necessary for the adequate enforcement, protection or preservation of the rights of the respective parties as declared in this judgment.'' This paragraph of the judgment has been in nowise affected by the decision of this court and is left undisturbed.

A second petition for a rehearing or further modification was denied on June 30, 1939. Edmonds, J., voted for a rehearing.